## STATE OF CONNECTICUT *v.* RAYMOND WILLIAMS

HOUSE, C. J., LOISELLE, BOGDANSKI, LONGO and SPEZIALE, Js.

Argued April 6—decision released October 11, 1977

*Herbert R. Scott* and, of the New Jersey bar, *William J. Ewing,* for the appellant (defendant).

*D. Michael Hurley,* assistant state's attorney, with whom, on the brief, was *C. Robert Satti,* state's attorney, for the appellee (state).

HOUSE, C. J. The defendant was indicted by a grand jury in New London County in November of 1973 for the crime of robbery in the second degree in violation of § 53a-135 (a) (2) of the General Statutes and with being a persistent dangerous felony offender, as defined by § 53a-40 (a). The state's attorney for New London County also filed an information charging the defendant with two counts of larceny in the second degree in violation of § 53a-123, alleging that the defendant stole two cars on September 24, 1972, the date of the occurrences which gave rise to the indictment for robbery in the second degree. The defendant was tried by a jury and found guilty of robbery in the second degree and of the two counts of larceny in the second degree. On March 1, 1974, after the jury had returned their verdict on those charges, the defendant was put to plea on part two of the indictment charging him with being a persistent dangerous felony offender. He pleaded guilty and on March 26, 1974, was sentenced to a term of not less than twelve years nor more than life on the indictment and not less than one nor more than three years on each count of the information.

At the trial, evidence was introduced from which the jury could reasonably have found the following facts: On September 24, 1972, around 10 p.m.,

four people were present at Sailor Ed's Restaurant in Stonington: Chester J. Godomsky, the owner; Susan Hoelzel, a waitress; and John Donovan and David Wilcox, two dishwashers. Two armed men, one of them being the defendant, entered the rear of the restaurant, tied the hands of the two dishwashers and ushered them into the main room of the restaurant where one of the men announced to Godomsky and Mrs. Hoelzel that it was a holdup. Mrs. Hoelzel and Godomsky were tied up and all four victims were forced to lie facedown on the floor. The perpetrators, after robbing the victims and the restaurant, departed, only to return a short time later to obtain the keys to Godomsky's car. About this time, Neil McKenzie and Carol Thomson arrived at the restaurant in a Volkswagen belonging to Carol Thomson's mother. The two robbers ordered them out of the car and into the restaurant where they were bound, forced to the floor and robbed. The robbers then fled the scene in the Volkswagen, abandoning the Mercury Cougar in which they had arrived. The Cougar was found to contain various items belonging to the defendant and his family, including an identification card bearing his picture. The Cougar was subsequently found to have been registered to Jack W. Roach in Rhode Island, and the Massachusetts license plates on the car were found to have been issued to Willie Smith for a 1965 Buick Wildcat. The Cougar had been reported as stolen. The Volkswagen was later recovered in New London.

The principal defenses offered by the defendant were an alibi supported by testimony of defense witnesses that he had been at work in Massachusetts at the time of the robbery and testimony that he had purchased the Cougar from Willie Smith.

The defendant has assigned numerous errors in the conduct of his trial on the robbery and larceny charges and has challenged the legality of the court's acceptance of his plea of guilty to the charge of being a persistent dangerous felony offender. He also has claimed that § 53a-40 (a), the persistent felony offender statute, is unconstitutional as applied to him. Particularly, he has pressed a claim of error in the court's refusal to exclude the identification testimony of Chester Godomsky, John Donovan and Susan Hoelzel, which evidence was admitted over his objections and exceptions and after his motions to suppress that testimony were denied.

The first witness to give identification testimony against the defendant was Godomsky, the owner of the restaurant. He had made an out-of-court identification based on photographs and had also made an in-court identification at the trial. He testified that he first saw the defendant when the two robbers walked the dishwashers into the restaurant and announced the holdup. He was face-to-face with the defendant standing up and got a very good look at him. He also observed his face frequently when the defendant came to where he was lying on the floor. The defendant was in the area near him for about fifteen minutes during the robbery. Godomsky described the defendant as a black male, well-dressed with horn-rimmed glasses — a clean-cut individual. Shortly after the robbery, the police examined the Cougar which had been abandoned in the restaurant parking lot and found in it an identification card imprinted with a photograph of the defendant. The police showed Godomsky the I.D. card and he told them that the picture on the card looked like the man

who had robbed him. He testified at the trial that at a later time he was called to the police station where he was shown a group of eight photographs and was asked if any of them were of the robbers. Among the photographs were two of the defendant, one of which was an enlargement of the I.D. card with paper placed across the writing and showing the defendant wearing horn-rimmed glasses. Godomsky picked out the enlarged I.D. card, but did not identify the other photograph of the defendant among the eight shown to him. In that photograph the defendant was not wearing glasses. He stated that when he saw the photograph which he identified he realized that it was a blowup of the I.D. card he had previously seen and he stated further: "I picked it because I still thought it was the same man." He also testified that he had seen the defendant at the grand jury hearing before the trial and that, a short time before the trial, he happened to see the defendant being led into the courthouse under guard and recognized him. Following the examination of Godomsky outside the jury's hearing, the defendant moved the court to exclude Godomsky's testimony concerning his pre-trial and in-court identification. The court denied the motion, and, in the presence of the jury, Godomsky testified to the pretrial identification and also made an in-court identification of the defendant.

John Donovan, one of the dishwashers who was tied up by the robbers, also identified Williams as one of the holdup men. He testified that he was in the kitchen when the defendant approached him with a revolver in his hand. The lighting in the kitchen was excellent and he was face-to-face with the defendant, only inches away. He had a good look at the defendant before he was tied up and

had another good look at him in the restaurant from a distance of one foot when the man crossed in front of him and another good look at him in the restaurant when Williams, with a gun, was questioning two other people. At that time, Donovan was six feet from Williams and could see his profile. He later saw Williams in court on the day of the grand jury hearing. He also made an in-court identification of Williams at the trial as one of the men who committed the robbery.

Another witness, Susan Hoelzel, also made an in-court identification of the defendant at the trial. She was a waitress at the restaurant and first observed the defendant, with a gun, walking towards her. The lighting was bright and she could see him clearly. Three weeks after the robbery, she had been shown several photographs by the police. She thought one looked familiar but could not tell for certain if he was the defendant because the man in the picture was not wearing glasses. She told the police, however, that he looked like the man who had held them up. She was positive in her in-court identification of Williams as one of the robbers.

Cases involving identification procedures have multiplied both before this court and before the United States Supreme Court since the 1967 decisions of the latter court in *United States* v. *Wade,* 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149; *Gilbert* v. *California,* 388 U.S. 263, 87 S. Ct. 1951, 18 L. Ed. 2d 1178; and *Stovall* v. *Denno,* 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199. See decisions of the United States Supreme Court in *Simmons* v. *United States,* 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247; *Foster* v. *California,* 394 U.S. 440,

89 S. Ct. 1127, 22 L. Ed. 2d 402; *Neil* v. *Biggers,* 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401; and, most recently, *Manson* v. *Brathwaite,* 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140; and the decisions of this court in *State* v. *Middleton,* 170 Conn. 601, 368 A.2d 66; *State* v. *Panella,* 168 Conn. 532, 362 A.2d 953; *State* v. *Hafner,* 168 Conn. 230, 362 A.2d 925; *State* v. *Smith,* 165 Conn. 680, 345 A.2d 41; *State* v. *Oliver,* 161 Conn. 348, 288 A.2d 81; *State* v. *Oliver,* 160 Conn. 85, 273 A.2d 867, cert. denied, 402 U.S. 946, 91 S. Ct. 1637, 29 L. Ed. 2d 115; *State* v. *Duffen,* 160 Conn. 77, 273 A.2d 863, cert. denied, 402 U.S. 914, 91 S. Ct. 1397, 28 L. Ed. 2d 657; *State* v. *Carnegie,* 158 Conn. 264, 259 A.2d 628, cert. denied, 396 U.S. 992, 90 S. Ct. 488, 24 L. Ed. 2d 455; and, most recently, *State* v. *Kinsey,* 173 Conn. 344, 377 A.2d 1095.

The United States Supreme Court in *Manson* v. *Brathwaite,* supra, 2252, reiterated that "[t]he standard, after all, is that of fairness," and that must be determined by the totality of the circumstances as particularly emphasized in the *Stovall* and *Biggers* cases. It observed (p. 2253) that "reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post-*Stovall* confrontations. The factors to be considered are set out in *Biggers,* 409 U.S. at 199–200 [93 S. Ct. 375, 34 L. Ed. 2d 401]. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." This is the

standard which this court has noted and followed. See, for example, *State* v. *Panella,* supra, 537, where we cited *Neil* v. *Biggers,* supra, as to the factors which must be considered, and quoted from *Simmons* v. *United States,* supra: "[E]ach case must be considered on its own facts, and . . . convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

In the present case, there can be no question whatsoever that the court properly admitted the in-court identification of the defendant by the witnesses John Donovan and Mrs. Hoelzel. Donovan had not been shown any photographs before the trial and made the in-court identification from his recollection of the robbery incident when he had a good look at the defendant, face-to-face in the well-lighted kitchen of the restaurant. Mrs. Hoelzel had viewed a group of photographs which included a photograph of the defendant taken while he was not wearing glasses and she did not identify him in any of those photographs, but at the trial she identified him with certainty from having seen him during the robbery.

The defendant most strongly asserts that the procedure by which the witness Godomsky identified him from photographs as one of the robbers was impermissibly suggestive and, therefore, should have been excluded. He concedes, as indeed he must, that the action of the police in showing Godomsky shortly after the robbery Williams' identification card impressed with his photograph in

which he was wearing horn-rimmed glasses was a legitimate procedure. See *Simmons* v. *United States,* supra; *State* v. *Middleton,* supra, 608; *State* v. *Mallette,* 159 Conn. 143, 149, 267 A.2d 438. He nevertheless claims that it was improper for the police later to include an enlargement of the small identification card photograph with several other photographs, including one of the defendant not wearing glasses, which were shown to Godomsky for identification purposes. The trial court concluded after hearing extensive evidence and argument that the procedure used was not impermissibly suggestive considering the totality of the circumstances, and we find no error in the ruling of the court and its conclusion. Adopting the precise language of the court in *Manson* v. *Brathwaite,* supra, 2254: "Surely, we cannot say that under all the circumstances of this case there is 'a very substantial likelihood of irreparable misidentification.' *Simmons* v. *United States* [390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247]. Short of that point, such evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." If any doubt remained as to the propriety of the court's ruling as to Godomsky's pretrial photographic identification, it was, under the circumstances, rendered harmless by the proper admission of his definite and certain in-court identification under the "two-pronged" inquiry as outlined in *State* v. *Smith,* 165 Conn. 680, 684, 345 A.2d 41; and *State* v. *Oliver,* 161 Conn. 348, 356, 288 A.2d 81. As we noted in *Smith* (p. 685): "[A] wit-

ness may, despite any irregularity or illegality in the procedure of identification from photographs, make an in-court identification if it is purged of the taint of the defective pretrial procedure by establishment of the fact that it is based upon disassociated and independent observation."

One other claim of error asserted by the defendant merits some extended discussion. It is that he did not knowingly and intelligently waive his right to a trial by jury on part two of the indictment by pleading guilty to being a persistent dangerous felony offender as defined in § 53a-40 (a) of the General Statutes, being a person who prior to the commission of the crime of robbery charged in part one of the indictment had been convicted and imprisoned for more than one year in Massachusetts for armed assault with intent to rob and robbing and stealing from another. In advancing this claim, the defendant relies upon the holding of such cases as *North Carolina* v. *Alford,* 400 U.S. 25, 31, 91 S. Ct. 160, 27 L. Ed. 2d 162; *Brady* v. *United States,* 397 U.S. 742, 90 S. Ct. 1463, 25 L. Ed. 2d 747; and *Boykin* v. *Alabama,* 395 U.S. 238, 242, 89 S. Ct. 1709, 23 L. Ed. 2d 274. In *Blue* v. *Robinson,* 173 Conn. 360, 373, 377 A.2d 1108, we have had recent occasion to discuss not only the holding of those cases but our own decisions following the decision in *Boykin* that the record should disclose an "affirmative showing" that a plea of guilty was intelligent and voluntary. It is to be noted that as in *Blue* the guilty plea in the present case was entered and accepted prior to the adoption in 1976 of §§ 2122–2124 of the Practice Book which now require that the judicial authority not accept a plea of guilty without first personally addressing the defendant and deter-

mining that he fully understands the constitutional rights which are waived by a plea of guilty and that there is a factual basis for the plea.

The record in the present case more than amply demonstrates that there is no merit whatsoever to the contention of the defendant that there was any violation of his constitutional rights and, affirmatively, that his plea of guilty was entered voluntarily and intelligently. Counsel on appeal has attempted without success to construe into an unconstitutionally accepted plea of guilty the defendant's dislike of the statutory term "persistent dangerous felony offender"[1] and his concern that a guilty plea as to part two of the indictment might be interpreted as a plea of guilty to the offense charged in part one of the indictment, thus jeopardizing an appeal from his conviction on part one.

---

[1] "The Defendant: I don't plead to being a persistent dangerous felon, but as far as my conviction in Massachusetts, I plead guilty.

The Court: You plead guilty to the fact that you were convicted?

The Defendant: Yes. Only not as being a persistent dangerous felony offender.

The Court: You don't like the words that they use, is that it?

The Defendant: Right, your honor.

The Court: All right. That's part of the information. That is what it alleges. Do you want to discuss this with him?

Mr. Silverberg [counsel for the defendant]: The charge, may I have it please, Mr. Clerk?

(Whereupon, there was a discussion between Mr. Silverberg and the defendant off the record.)

The Court: Do you understand now?

The Defendant: Yes, I understand.

The Court: Do you still plead guilty to the charge?

The Defendant: Yes.

The Court: Do you wish to have him read it again to you? Do you wish to have the clerk read the information to you again?

The Defendant: No. I understood the information.

The Court: Your plea is—

The Defendant: Guilty.

The Court: All right. Guilty. All right."

After the plea of guilty was entered and before it was accepted the state's attorney fully explained to the court the factual basis for the charge, which was the defendant's 1963 conviction in Massachusetts of the crime of armed robbery for which the defendant received a sentence of not less than eight nor more than ten years to the Massachusetts correctional institute at Walpole. A certified copy of the record of that conviction was admitted as an exhibit. In answer to inquiries by the court, the defendant stated that he had discussed his guilty plea with his counsel, that he was satisfied with his counsel's advice, that he understood that by pleading guilty he was giving up his rights to have the state's attorney present evidence, to have a trial, and to have an opportunity for his counsel to cross-examine the appropriate witnesses, that he was waiving his rights against self-incrimination and was admitting that he had been found guilty of the 1963 offense in Massachusetts, that he was the same Raymond Williams who was found guilty by the court in Massachusetts in 1963, and that there was nothing further he wished to say.[2]

On this record, there is certainly no merit to the defendant's present contention that the court erred

---

[2] The defendant has briefed a claim that he was confused by what was happening, relying primarily on the fact that after the colloquy which we have printed in footnote one, supra, he asked the court:

"Is there going to be a court proceeding in regards to this plea of guilty? In other words, is there going to be a trial?"

Thereupon the court clearly explained the situation as follows:

"The Court: No. You are pleading guilty today. It eliminates the necessity of a trial.

Mr. Silverberg: On the part B.

The Court: On the part B portion. In other words, what happens here, Mr. Williams, is that by your pleading guilty to the part B information you have eliminated the necessity of a second

in accepting his plea of guilty to the second part of the indictment, and we also note, in passing, that during the twenty-five days intervening between his guilty plea and the imposition of sentence the defendant made no move to withdraw his guilty plea. It was not until the present appeal was filed that the defendant for the first time made the claim that his plea was not intelligently and voluntarily entered.

The defendant's remaining claims of error do not require extended discussion. His attack on the constitutionality of § 53a-40 (a) — the dangerous felony offender statute — is groundless. As his brief of necessity admits, the constitutionality of persistent offender statutes has long been upheld. See *Spencer* v. *Texas,* 385 U.S. 554, 87 S. Ct. 648, 17 L. Ed. 2d 606, rehearing denied, 386 U.S. 969, 87 S. Ct. 1015, 18 L. Ed. 2d 125; *Graham* v. *West Virginia,* 224 U.S. 616, 32 S. Ct. 583, 56 L. Ed. 917; and the decisions of this court in *State* v. *Rose,* 168 Conn. 623, 637, 362 A.2d 813; *State* v. *Grady,* 153 Conn. 26, 35, 211 A.2d 674; and *State* v. *Mead,* 130 Conn. 106, 109, 32 A.2d 273.

---

trial. Now, the second trial would be a proceeding that would take probably twenty minutes or half an hour. All Mr. O'Brien [state's attorney] would have to do is bring down the proper witnesses from the state of Massachusetts to testify that you were tried back in 1963. That there was a complete trial. This was the finding of the court and it would test the records of the court. Do you understand that?

The Defendant: Right. I understand that.

The Court: Now, are you the same Raymond Williams that was found guilty by this court in Massachusetts in 1963?

The Defendant: Yes, I am.

The Court: You are. Is there anything else you wish to ask or add at this time?

The Defendant: Not at this time, no, your Honor.

The Court: All right."

As to his claim that "this incident should have been viewed as an isolated incident" and "the sentence given was excessive under the circumstances," not only will this court not review the proper exercise of the court's discretion in imposing a sentence which is within the limits fixed by statute for the offense charged; see *State* v. *Kyles,* 169 Conn. 438, 444, 363 A.2d 97; *State* v. *Rose,* supra, 638; *State* v. *LaPorta,* 140 Conn. 610, 612, 102 A.2d 885; *State* v. *Van Allen,* 140 Conn. 39, 44, 97 A.2d 890; *State* v. *Horton,* 132 Conn. 276, 278, 43 A.2d 744; but it does not appear that the present claim was ever made to the trial court at the time of sentence. See Practice Book § 652; and *State* v. *Malley,* 167 Conn. 379, 386, 355 A.2d 292; *State* v. *Evans,* 165 Conn. 61, 67, 327 A.2d 576; and cases cited therein. Furthermore, we have no record whatsoever upon which to predicate an opinion as to the severity of the sentence if it were proper to do so. We do note from the transcript of the sentencing proceedings that according to remarks of the state's attorney the prior criminal activity of the defendant was much more extensive than suggested by the recitals in the defendant's brief. The defendant's contention, unsupported by anything in the record, " 'is simply an appeal for clemency made to a court which has no discretionary jurisdiction in the matter.' " *State* v. *Chuchelow,* 128 Conn. 323, 324, 22 A.2d 780; see *State* v. *McNally,* 152 Conn. 598, 603, 211 A.2d 162.

The defendant has briefed two claims of error in the court's charge to the jury. The first is that the court failed to charge adequately on the knowledge element of larceny as charged in the first count of the information which related to the larceny of the Mercury Cougar, and the second is that the

court did not charge sufficiently with respect to the factors which the jury should consider in determining the credibility to be accorded the testimony of witnesses. The dispositive answer to those claims of error is that the defendant took no exception to the charge as given. Practice Book § 249; *State* v. *Lockman,* 169 Conn. 116, 124, 362 A.2d 920; *Neal* v. *Shiels,* 166 Conn. 3, 16, 347 A.2d 102; *State* v. *Magoon,* 156 Conn. 328, 335, 240 A.2d 853.

In the absence of any exception to the charge, we would ordinarily give no further consideration to the defendant's present attack on it. Appellate counsels' criticism of trial counsel, however, for his "inexplicable failure" to object to the charge has prompted us to examine it. We find no error in the charge as to larceny. The court properly read the applicable portion of the statutes to the jury, explained the meaning of the statutes as it related to the theft of the Cougar and read subsection eight of § 53a-119 of the General Statutes to the jury in its entirety. This subsection provides that the reception of stolen property constitutes the crime of larceny when it is received "knowing that it has probably been stolen or believing that it has probably been stolen." Proof of possession of recently stolen property by itself, not satisfactorily explained, can support a conviction of larceny. *State* v. *Palkimas,* 153 Conn. 555, 219 A.2d 220; see *State* v. *Huot,* 170 Conn. 463, 365 A.2d 1144. There was sufficient evidence for the jury to find by inference that the defendant knew that the Cougar was stolen. See *State* v. *Schoenbneelt,* 171 Conn. 119, 126, 368 A.2d 117; *State* v. *Pambianchi,* 139 Conn. 543, 546, 95 A.2d 695. The court also properly and adequately charged the jury as to their function in determining the credibility of wit-

nesses and the weight to be given to their testimony. Appellate counsels' criticism of trial counsel is not warranted.

We find no merit whatsoever to the defendant's claim that the court erred by permitting a court stenographer different from the one who had earlier taken down certain testimony to read it to the jury after they had requested that it be read back. Not only is there nothing in the record which would indicate that the reading was in any way inaccurate but no objection was made to the trial court. As we have noted time and again, our rules do not permit a defendant in a criminal case to fail to object to matters occurring during a trial until it is too late for them to be corrected or even considered and then, if the outcome proves unsatisfactory, to raise them for the first time on an appeal. Practice Book § 226; *State* v. *Johnson,* 166 Conn. 439, 445, 352 A.2d 294; *State* v. *Taylor,* 153 Conn. 72, 86, 214 A.2d 362, cert. denied, 384 U.S. 921, 86 S. Ct. 1372, 16 L. Ed. 2d 442.

The same rule is fully applicable to the claim that the court erred when in the absence of the defendant and counsel it permitted the jury to suspend their deliberations and to go unescorted out to lunch. It did so after giving them explicit instructions as to their conduct and not to discuss the case or permit anyone to talk to them. There was no requirement that the jury be sequestered and when the court reconvened after lunch there was no complaint or objection or motion for mistrial. Although the defendant has discussed in his brief what impropriety or prejudice to the defendant could have been possible, there is nothing whatsoever in

the record to indicate that any occurred or resulted. We find no error in this exercise of the court's discretion.

There is no error.

In this opinion LOISELLE and SPEZIALE, Js., concurred.

LONGO, J. (dissenting). I do not agree with the majority that the identification testimony of Chester Godomsky was properly admitted into evidence. This identification testimony was particularly crucial to the defendant's conviction since his principal defense was his claim that he was at work in Massachusetts at the time of the robbery.

The defendant argues that the procedure by which the defendant's photograph was identified by Godomsky was so suggestive as to deny him due process of law according to the standard enunciated by the Supreme Court in *Simmons* v. *United States,* 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247, where the court discussed (p. 384) "the hazards of initial identification by photograph." See *State* v. *Hafner,* 168 Conn. 230, 362 A.2d 925; *State* v. *Smith,* 165 Conn. 680, 685, 345 A.2d 41; *State* v. *Oliver,* 160 Conn. 85, 91, 273 A.2d 867, cert. denied, 402 U.S. 946, 91 S. Ct. 1637, 29 L. Ed. 2d 115. The *Simmons* court noted (p. 384) that photographic identification procedure "has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs." We noted in *State* v. *Smith,* supra, 684: "Application of the *Simmons* test does not alter the settled rule that the reliability of properly

admitted eyewitness identification, like the credibility and weight to be given to the testimony of any witness, is for the jury to determine but recognizes that, in some cases, the procedures leading to an eyewitness identification may be so suggestive as to make the identification constitutionally inadmissible as a matter of law. *Foster* v. *California*, 394 U.S. 440, 442 n.2, 89 S. Ct. 1127, 22 L. Ed. 2d 402."

The defendant's claim must be tested by a two-pronged inquiry. First, the court must ask whether the identification procedure was impermissibly suggestive and, second, if it was so, whether under the totality of the circumstances it was likely to produce irreparable misidentification and consequently require that the in-court identification not be presented to the jury. *Simmons* v. *United States,* supra, 383; *Stovall* v. *Denno,* 388 U.S. 293, 301, 87 S. Ct. 1967, 18 L. Ed. 2d 1199; *State* v. *Smith,* supra, 684. In *Simmons* v. *United States,* supra, 383–84, the court discussed the serious problem that the use of photographs, even under the "most correct photographic identification procedures" may create an inherent danger of misidentification. The court continued, stating: "This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. . . . Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." These observations

are supported by a substantial body of judicial and scholarly literature emphasizing the inherent unreliability of eyewitnesses and especially photographic identification testimony.[1]

The United States Supreme Court dealt significantly with eyewitness identification in *United States* v. *Wade,* 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149. The *Wade* court (p. 228) cautioned: "A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." The court continued (pp. 228–29) to quote with approval the assertion from Wall, Eye-Witness Identification in Criminal Cases, p. 26, that "[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor — perhaps it is responsible for more such errors than all other factors combined." As the *Wade* court stated (p. 229): "Suggestion can be created intentionally or unintentionally in many subtle ways." The court stated further (p. 235): "We do not assume that these risks are the result of police procedures intentionally designed to prejudice an accused. Rather we assume they derive from the dangers inherent in

[1] See Wall, Eye-Witness Identification in Criminal Cases; Levine & Tapp, "The Psychology of Criminal Identification: The Gap from *Wade* to *Kirby*," 121 U. Pa. L. Rev. 1079; Sobel, "Assailing the Impermissible Suggestion: Evolving Limitations on the Abuse of Pre-Trial Criminal Identification Methods," 38 Brooklyn L. Rev. 261; note, "Pretrial Identification Procedures — *Wade* to *Gilbert* to *Stovall:* Lower Courts Bobble the Ball," 55 Minn. L. Rev. 779; comment, "Photographic Identification: The Hidden Persuader," 56 Iowa L. Rev. 408; Wigmore, The Science of Judicial Proof (3d Ed.) § 253; Williams & Hammelmann, Identification Parades, Parts I & II, 1963 Crim. L. Rev. 479–90, 545–55.

eyewitness identification and the suggestibility inherent in the context of the pretrial identification." These observations are particularly pertinent in this case. Here, Godomsky was shown a single picture which he said "looked like" the man who had robbed him. Sometime later he was shown a blown-up copy of this same I.D. card with distinguishing characteristics of the card only partially obscured from view by a piece of paper secured by tape. The blown-up I.D. card was significantly larger than the seven other photos with which it was exhibited and was further distinguished by its shape. The witness admitted on cross-examination that he recognized the photo as the I.D. card he had previously been shown. He failed to identify another photo of the defendant which was among the same group of photos, but which was not distinguished in shape, size or type from the others and which he had not previously seen. The opportunity of the witness to observe the robbers was extremely limited since he spent most of the time of the robbery tied up, face-down to the floor in a dimly-lighted restaurant. His lack of opportunity to observe the defendant was reflected in contradictions in his testimony concerning the respective size and roles of the robbers. It was also established on cross-examination that the witness had inadvertently observed the defendant under guard being brought into the courthouse before the trial and that he had seen him at the grand jury hearing where he was clearly identified as the defendant. These last facts, standing alone, however, are not sufficient to exclude the identification testimony; *State* v. *Duffen,* 160 Conn. 77, 273 A.2d 863, cert. denied, 402 U.S. 914, 91 S. Ct. 1397, 28 L. Ed. 2d 657; but they, combined with the preceding facts, lead me to conclude that the photographic

identification procedure was impermissibly sugges-
tive, and that the lower court acted erroneously by
allowing the witness Godomsky to testify concerning
the out-of-court identification. *Simmons* v. *United
States,* supra; *Foster* v. *California,* supra. While
the first viewing of a single photograph of the
defendant was justified by the necessity for imme-
diate pursuit, the second viewing could not be justi-
fied by any such necessity. The police had had a
substantial amount of time within which to identify
and track down the suspect. The identification pro-
cedure was no longer justifiable as an urgent
attempt to single out a suspect while the trail was
still hot. Rather, its purpose was similar to that
of a lineup after a suspect had already been singled
out. The police had even obtained another photo-
graph of the defendant, yet the witness was shown
the distinctive photograph which he recognized as
the photo he had been shown shortly after the crime.
Under these circumstances, I am unable to distin-
guish the second viewing from the first, except that
the second was not compelled and, therefore, not
justified by the necessity of the first. It is further
significant that the witness failed to make a certain
identification the first time he was shown the I.D.
card. It was only at the second viewing that he
identified the face on the I.D. card as that of one of
the robbers.

Having determined that the pretrial identification
procedure in this case was impermissibly suggestive
I am also of the opinion that the in-court identifica-
tion was erroneously permitted. We stated in *State*
v. *Smith,* 165 Conn. 680, 685, 345 A.2d 41, that "a wit-
ness may, despite any irregularity or illegality in
the procedure of identification from photographs,
make an in-court identification if it is purged of

the taint of the defective pretrial procedure by establishment of the fact that it is based upon disassociated and independent observation. See *United States* v. *Wade,* 388 U.S. 218, 241, 87 S. Ct. 1926, 18 L. Ed. 2d 1149; *Wong Sun* v. *United States,* 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441; *Rudd* v. *Florida,* 477 F.2d 805, 812 (5th Cir.); *State* v. *Oliver* [161 Conn. 348, 356, 288 A.2d 81]. 'The effort must be to determine whether, before the imprint arising from the unlawful identification procedure, there was already such a definite image in the witness' mind that he is able to rely on it at trial without much, if any, assistance from its successor.' *United States ex rel. Phipps* v. *Follette* [428 F.2d 912, 914–15 (2d Cir.), cert. denied, 400 U.S. 908, 91 S. Ct. 151, 27 L. Ed. 2d 146]; *United States ex rel. Bisordi* v. *LaVallee* [461 F.2d 1020, 1023 (2d Cir.)]." The identification procedure employed in this case did more than merely affect the weight to be accorded the witness' identification testimony. Rather, the procedure required its exclusion as a matter of law. See *United States* v. *Fowler,* 439 F.2d 133 (9th Cir.). The burden rested on the state to prove by clear and convincing evidence that the in-court identification was based upon the witness' observation of the defendant exclusive of the impermissibly suggestive photo identification procedure. *Wade* v. *United States,* supra; *Mason* v. *United States,* 414 F.2d 1176 (D.C. Cir.). The state did not meet this burden. In *Smith* (p. 686) we listed as indicative of the witness' untainted recollection of the defendant "the similarity between the description of the defendant he gave to the police prior to seeing the police photographs and the defendant's own physical characteristics, the one-half hour during which [the witness] had the opportunity to

observe the robber in a well-lighted area and in close physical proximity prior to and during the commission of the crime, and the positiveness with which [the witness] identified the defendant." In the present case, Godomsky's failure to give a detailed description of the defendant before viewing the photograph, the difficulty of observing the robbers during the crime, and the witness' initial hesitance in identifying the defendant lead me to a conclusion opposite from that reached in *Smith*. The second time the same photo was shown to Godomsky, it was presented in an impermissibly suggestive manner which created a substantial possibility that Godomsky's identification of the defendant as one of the men who robbed the restaurant stemmed from his recognition of the picture rather than from his independent memory of the appearance of any of the participants in the events of the night of September 24, 1972. Allowance of the in-court identification by Godomsky deprived the defendant of the due process of law to which he was entitled under the fourteenth amendment to the United States constitution. *Foster* v. *California*, 394 U.S. 440, 89 S. Ct. 1127, 22 L. Ed. 2d 402.

In this opinion BOGDANSKI, J., concurred.