STATE OF CONNECTICUT *v.* DAVID DOOLITTLE
(9716)

SPEZIALE, C. J., PETERS, HEALEY, SHEA and GRILLO, Js.

Argued November 8, 1982—decision released February 8, 1983

*G. Douglas Nash,* assistant public defender, for the appellant (defendant).

*Robert J. O'Brien,* assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *Roland D. Fasano,* assistant state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. After a trial to the jury the defendant was convicted of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3).[1] Just prior to the trial, the court, *Reynolds, J.,* held an evidentiary hearing on the defendant's "Motion to Suppress Eye Witness Identification and/or Photographic Identification" and denied that motion.[2] At the end of the state's

---

[1] General Statutes § 53a-134 (a) (3) provides: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (3) uses or threatens the use of a dangerous instrument . . . ."

[2] This motion recited the following:

"1. The defendant moves that any eye witness identifications, or any photographic identifications; made of the defendant, be suppressed in any and all proceedings against the defendant, and that any witness making an identification not be permitted to make an

case in chief, the court granted the defendant's oral motion to reopen the hearing on this motion to suppress to add testimony that had come out during the trial. The court denied the motion to suppress after considering the additional testimony. The court also denied an oral motion for discovery and production of certain exculpatory information, made at the end of the state's case.[3] In this appeal the defendant claims that the trial court erred in twice denying his motion to suppress and in denying his oral motion for discovery and production.

### PRETRIAL IDENTIFICATION SUPPRESSION HEARING

The circumstances surrounding the court's action denying the motions to suppress prior to trial and after an evidentiary hearing are the following: On July 21, 1978, at about 10:30 p.m. Gail Cook was working as a clerk-cashier at the Food Bag store on West Main Street in Meriden. At that time there were about six people in the store. While Cook was attending a customer, Lucy Kennedy, at the reg-

in court identification concerning the defendant, because of the prejudicial method of confrontation between the defendant, and/or his photograph.

"2. The defendant asks for a hearing to determine the exact procedures followed in showing photographs of the defendant, or in exposing the defendant to witnesses in this case.

"3. Said procedures violate the principles laid down in *U.S.* v. *Wade,* 388 U.S. 218 (1967), *Gilbert* v. *California,* 388 U.S. 263 (1967) and *Stovall* v. *Denno,* 388 U.S. 293 (1967), said identification should be suppressed.

"4. Any illegal pre-trial confrontation of the accused with any witness will deny the defendant his basic right to a fair trial in that he can no longer meaningfully cross examine the witnesses against him, and said procedures deny him the effective assistance of counsel, both at trial and at a pre-trial stage.

"5. The defendant moves that the court exclude any illegal identifications, or mention of them, at the trial itself."

[3] This motion was in addition to the defendant's earlier written motion which had been granted before trial and which had, in part, requested "[a]ny and all exculpatory information or materials. . . ."

ister, a young man with a bandana around his face walked in. As he walked through the door the bandana fell down off his face. He approached Cook and said "it's [your] turn again, baby, this is a holdup." She recognized his face as she had seen him in the store before. She thought he was joking. She "kind of argued with him" and he repeatedly asked her to give him the money and she refused, shutting the cash register drawer. The bandana kept falling down and he kept putting it back up. He was just over the counter from her. The store was fully lit by fluorescent lighting. He eventually pulled out a knife and leaned over the counter even closer to her, "only two or three feet away." She then gave him the money, he fled and she called the police.

When the police arrived, she gave them a detailed description of the robber including height, weight, age, hair and clothing, and told them that she had seen him in the store before.[4] On the night of the robbery she was taken to the police headquarters in Meriden where she reviewed trays of mug shots and she selected a photo of the defendant. Detective Fred J. Bucchieri, who investigated the robbery, brought this photo to court with him; it became an exhibit at the suppression hearing.[5] Cook told the police that the photo was of the

---

[4] Cook gave a written statement to the police on July 22, 1978. That statement said in part: "I would describe the holdup man as follows: White male, 20 years of age, approximately, about five ten or five eleven, tall, slim build, dirty blond hair, long and not quite touching the shoulders, and I think it was parted in the center.

"He was wearing a jean jacket, waist length, jean pants, and a faded-type shirt that fitted the jean outfit, and I would recognize him if I ever saw him again. He also had a long thin face."

Defense counsel had the benefit of this statement for the motion to suppress.

[5] This photo of the defendant was also introduced as an exhibit at the trial.

robber but that the length of hair and the fullness of face of the man who robbed her was different from the photo. On cross-examination she remained steadfast in her identification of this photo.[6]

On August 31, 1978, Cook returned to Meriden police headquarters at the request of the police where she viewed an array of seven photos. She picked one photo from this array which she told the police was that of the defendant. This photo was one of the defendant taken in 1978; the photo of the defendant she had selected on July 22 was taken in 1975. Bucchieri testified that he went to Cook's house sometime between July 21 and August 31 and showed her some photos. He, however, had no record of these photos nor did he make a report on it.

### THE TRIAL

Lucy Kennedy testified that on the night of the robbery she drove to the Food Bag store with her sister-in-law to purchase a bottle of juice. While she was at the counter paying Cook, a man with a bandana over his face came in. She heard him say, "[i]t's your time again" to Cook, and the latter turned over the money after he drew out a knife

---

[6] When Cook was questioned on cross-examination, the following took place:

"Q. And I think you described that [photo] as a suspect; is that correct?

"A. *I said that was him.*

"Q. At that time you did not say that you could make a positive identification?

"A. They [the police] said that it had to be precise, and I said that was his face except the hair length was shorter, and there was a discrepancy in the fullness of the face.

"Q. At that time did you say whether or not that was a positive identification?

"A. *I said it was him.*

"The Court: You said what?

"A. *I said it was him.*" (Emphasis added.)

and held it towards Cook. While in the store she observed the front and side of his face. Although the robber told Kennedy not to go anywhere, she walked behind him and ran out of the store. She estimated that the events of the robbery inside the store took up approximately two minutes. She got in her car and at this point she saw the robber running outside across the storefront toward a side street. At that point she observed him as the bandana was down around his neck. At that time she was about twenty feet from him looking through the window of her car. There were lights at the gas pumps[7] and in the store. Kennedy then returned to the store, talked to the cashier and called the police to whom she gave a description. Although she went to the police station that night, she did not make an identification of the robber from the photos she viewed.[8]

Cook also testified at the trial and her testimony on her identification of the defendant from police photos was essentially as she had testified on the motion to suppress. She told the jury that as he walked through the door he said "[i]t's your turn again, baby"[9] and that the bandana "fell off his face, down below his chin" as he approached the counter. She refused to give him the money, thinking he was joking, until he pulled a knife and then she took him seriously. She saw him "full in

---

[7] The store sold gasoline from pumps in front of the store.

[8] Kennedy was not asked to view any photos for the police after the night of the robbery. At the trial, after a voir dire in the jury's absence on Kennedy's "out-of-court identification" of the robber from photos, defense counsel withdrew (as to her) "the motion to suppress any out-of-court identification, of course, since there was none."

[9] She testified before the jury that "[t]he store had previously been robbed, and the write-up was in the papers of maybe a matter of two or three days before this."

the face" and she had seen him before. Cook recounted for the jury the description she had given the police on the night of the incident as well as the circumstances of her selection of the defendant's 1975 photo on July 21, 1978, and of his 1978 photo on August 31, 1978. She maintained that no police officer had shown her any photos at any time other than on July 21 and August 31. Additionally, she made an in-court identification of the defendant during the trial.

Bucchieri also testified at the trial that Cook had picked out a 1975 photo of the defendant on July 21, 1978, and that on August 31, 1978, she picked out a 1978 photo[10] of him from an array of seven photos he had prepared. He testified that she had "[n]o doubt whatsoever" about the 1978 photo. Bucchieri's testimony on cross-examination about Cook's selection of the 1975 photo of the defendant at the police station was later advanced as a basis[11] by the defense for moving to reopen the court's earlier denial of the defendant's motion to suppress

---

[10] Bucchieri had Cook initial this photo and it was introduced into evidence at the trial. He did the same and dated it. The seven photos used in the August 31, 1978 spread were all in evidence as exhibits.

[11] After the state rested its case, defense counsel made some motions to the court. One motion was stated as follows:

"Mr. Nash: Thank you, your Honor. The second matter—I would ask your Honor to reopen the motion to suppress the identification and add to the facts thereon, that the Detective, who testified here, Bucchieri, testified that Mrs. Cook picked out more than one photograph on July 21st; that there was not a positive identification; that the photographs resembled the person; and secondly, to reflect that between the dates of July 21, '78 and August 31, Detective Bucchieri testified that Mrs. Cook looked at photographs of suspects at Mrs. Cook's home; that Detective Bucchieri showed the photographs to Mrs. Cook; that no record was made of what photographs were shown to Mrs. Cook. I would ask that the motion to suppress be reopened and that your Honor also take that into consideration, whether or not the denial of the motion to suppress ought to be reassessed."

along with Bucchieri's testimony that he thought that on one occasion between July 21 and August 31 he had shown Cook some police photos at her home.

The defendant claims that the identification procedures were impermissibly suggestive and unreliable and that, therefore, the denial of suppression of the identification was error. We do not agree.

"'In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the 'totality of the circumstances.'" (Citations omitted.) *State* v. *Theriault*, 182 Conn. 366, 371–72, 438 A.2d 432 (1980); see *State* v. *Ledbetter*, 185 Conn. 607, 611, 441 A.2d 595 (1981). "'[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic indentification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' *Simmons* v. *United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968)."[12] *State* v. *Anderson*, 178 Conn. 287, 291, 422 A.2d 323 (1979).

In making his claim, the defendant, pointing to the fact that no record was made of the photos Cook

___

[12] We have already noted that defense counsel orally withdrew his motion to suppress identification as to the customer, Lucy Kennedy. When Kennedy testified at the trial, she testified three times that she believed that the defendant who was in the courtroom was the robber. Unlike Cook, Kennedy did not testify at the pretrial suppression hearing.

selected on July 21, maintains that her testimony as to that identification coupled with Bucchieri's testimony that she was not positive at that time, along with the other identification procedures, satisfies the first prong of the test. Included in this argument is his claim that an identification procedure, for which the photos allegedly used are not available, took place between July 21 and August 31 when Bucchieri went to her house with police photos for her to view. Cook denied that this ever took place but Bucchieri's testimony suggests the contrary although he had no report of its occurrence.[13] The defendant argues further that the photo array, which she viewed on August 31,[14] repeating as it did the defendant's photo as well as placing it among other photos not resembling the robber emphasized his photo[15] and, thus, raised the danger of misidentification to an impermissibly suggestive level.

Even if we were, arguendo, to consider that these circumstances made the identification process suggestive, the defendant still could not prevail if the

[13] During the trial, the court granted defense counsel's motion to reopen his motion to suppress. It is apparent from the transcript that, as to the claimed third identification procedure between July 21 and August 31, the trial court made no finding that it, in fact, had occurred. Rather, and properly so, it left the testimony of both Cook and Bucchieri "as both have testified to [it]" to the jury. It also said at that time: "The weight that the jury will give it, and the credibility they attach to the testimony, whatever argument you make to the jury, will be for the jury to determine . . . ."

[14] Cook testified that Bucchieri called her on August 31 and said that "he had more photographs that he wanted me to go over and see if I could find the suspect in the photographs."

[15] On cross-examination Cook, upon being shown six (exhibits C1 through C6) of the seven photos (the seventh, i.e., exhibit E, was that of the defendant which she selected on August 31), testified that it was fair to say that the other photographs were very different from the photograph that she picked out.

identification itself was nevertheless reliable in light of the totality of the circumstances. This is so because reliability is the linchpin in determining the admissibility of identification evidence.[16] *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *State* v. *Ledbetter,* supra, 614; *State* v. *Theriault,* supra, 373; *State* v. *Gold,* 180 Conn. 619, 655, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980). "The standard, after all, is that of fairness as required by the Due Process Clause of the Fourteenth Amendment." *Manson* v. *Brathwaite,* supra, 113; *State* v. *Piskorski,* 177 Conn. 677, 742, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979). "Reliability is to be determined by the totality of the circumstances as emphasized in *Stovall* v. *Denno,* 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967), and *Neil* v. *Biggers,* 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). *State* v. *Piskorski,* [177 Conn. 677, 742, 419 A.2d 866 (1979)]." *State* v. *Gold,* supra, 655. " '[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' *Neil* v. *Biggers,* [409 U.S. 188, 199–200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972)]; *State* v. *Williams,*

---

[16] This is so in determining the admissibility of both the pretrial and the in-court identifications. *State* v. *Piskorski,* 177 Conn. 677, 742, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979), citing *Manson* v. *Brathwaite,* 432 U.S. 98, 106–107 n.9, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

173 Conn. 545, 551, 378 A.2d 588 (1977). 'Against these factors is to be weighed the corrupting effect of the suggestive identification itself.' *Manson* v. *Brathwaite,* [432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)]; *State* v. *Williams* [173 Conn. 545, 551, 378 A.2d 588 (1977)]." *State* v. *Ledbetter,* supra, 614.

The reliability of the identification is disclosed by the circumstances, most of which have already been set out. Cook had a sufficient opportunity to observe the robber at the time of the crime. Her degree of attention to him was quite adequate including that period when she thought he was joking about robbing her; she also insisted on cross-examination that she had "concentrated" on him. Her prior description, including her written statement to the police on the night of the robbery, was not only quite accurate but detailed. The level of certainty demonstrated by her was high.[17] Under the circumstances the brevity of time between the crime and the confrontation contributed to the conclusion of reliability. On July 21, the night of the robbery, she viewed several hundred police photos and picked out only one photo—that of the defendant. Cook again picked the defendant's photo right out on August 31; Bucchieri himself said she did it without any doubt. At no time did she identify anyone other than the defendant as the robber. The trial court was not in error in concluding that the identifications should not be suppressed.

[17] Bucchieri testified that under the "mug shot system" the photos are kept in trays with each tray being at least two feet long. On July 21, Cook viewed "a number of these draws [sic]" or trays and each "draw [sic]" contained "[m]aybe 100, 150" photos according to Bucchieri. Cook said she spent a couple of hours that night viewing such photos.

The defendant's other claim is that the trial court erred in denying his oral motion for production of exculpatory information which he made after the state rested. He maintains that the state should have been ordered to produce the photos shown to Cook by Bucchieri when he allegedly went with photos to her home between July 21 and August 31. This, he continues, would enable him to determine if she was shown a photo of the defendant and failed to identify him. Additionally, he argues that he could ascertain if any of the photos shown Cook at that time were repeated in the August 31 viewing. He then reasons that if such a rejected photo reappeared on August 31 as one of the six photos in that spread that was not of the defendant, it would therefore strengthen his claim that the August 31 identification procedure was suggestive. He also moved for the discovery and production of the photos selected by Cook and Kennedy on July 21. Included in his argument here is the claim that Cook selected more photos on July 21 than just that of the defendant. Production of these photos would, he asserts, have allowed him to cross-examine Cook and Kennedy, "on their inability to positively identify the Defendant as the robber." It is then his position that if any of those were "very different either from the description of the robber or from a fair description of the defendant" the issue of this identification of the defendant as the robber, which "was the sole issue in the trial" would have been in "much doubt." We must reject these claims.[18]

---

[18] Although not referred to by the defendant, we keep in mind that both General Statutes § 54-86c and Practice Book § 741 require the prosecuting authority to disclose to a defendant all "exculpatory information or material."

The defendant maintains that a "specific request for the photographs was made during trial at the earliest possible opportunity" after Bucchieri's statement that the photographs existed. This request was made on June 4, 1980, after the state had rested and after defense counsel by his cross-examination had just elicited that no record had been made of the photos either Cook or Kennedy selected on July 21 or which Cook had "viewed" on that occasion when Bucchieri had allegedly brought photos to her home sometime between July 21 and August 31.

Before trial, the defendant had filed a motion for discovery and inspection which sought inter alia: "Any and all exculpatory information or materials." The state's response to that request, which was filed on May 29, 1979, was "Possible exculpatory material hereto attached."[19] Despite the fact that the material thus made available long before trial indicated to him the existence of "possible exculpatory material" in the viewing of mug shots by the witnesses, he seems to argue that the state's response cannot be said to have alerted him to which materials to request although his motion was for the photos the witnesses viewed and those they selected as resembling the robber. This con-

[19] The "materials attached hereto" read: " 'Mrs. Kennedy stated that she was with her sister-in-law who sat in her car on the passenger side at the gas pump (Barbara Ceta). She saw nothing and was made aware of the holdup when Mrs. Kennedy returned to the car. Mrs. Kennedy went back to see if the clerk was all right and then called the police who arrived shortly after.

" 'Mrs. Cook was interviewed also at police headquarters with a statement taken.

" 'Detective Terry photographed the Food Bag.

" 'Mug shots were shown to witnesses at headquarters. Lucy Kennedy and Gail Cook could not make a positive ID but picked out a few pictures resembling the holdup man. The men will be checked out on Monday July 24, 1978. Detective F. J. Bucchieri.' "

travenes common sense as to the photos selected on July 21 by both witnesses because the response to discovery and inspection clearly demonstrates that photos were picked out at that time. As to the alleged identification procedure between July 21 and August 31 at Cook's home, we note that counsel for the state, in argument on this motion in the trial court, told the court that it was not until August 31 that the police had a second photo of the defendant so as to enable them to "show another display [to Cook]."

In pressing his position here the defendant argues that the law has centered around the cases of *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *United States* v. *Agurs,* 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976).[20] This presents a fair starting point in our analysis. In *Brady* the court held that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or the bad faith of the prosecution." *Brady* v. *Maryland,* supra, 87. In refining the *Brady* rule, *Agurs* said that it "arguably applies in three quite different situations": (1) where the prosecution's case includes perjured testimony that the prosecution knew of or should have known of; (2) where there has been a pretrial request for specific evidence; and (3) where there has been a general request for exculpatory material or no request at all. *United States* v. *Agurs,* supra, 103–107. *Agurs*

---

[20] We have said that although *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1964), and *United States* v. *Agurs,* 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), dealt with evidence disclosed to the defense after a trial, it is logical that the same standards apply before and during trial. *State* v. *Packard,* 184 Conn. 258, 278, 439 A.2d 983 (1981).

points out that where a request is made for "all *Brady* material" or for "anything exculpatory," "[s]uch a request really gives the prosecutor no better notice than if no request is made . . ." and that such a request is "a general request." *United States* v. *Agurs,* supra, 106–107; see also *Wagster* v. *Overberg,* 560 F.2d 735, 739 (6th Cir. 1977). The defendant's pretrial request under the circumstances was general. Where only a general request is made, the burden is on the defendant to establish that the failure to disclose is a denial of due process. *Talamante* v. *Romero,* 620 F.2d 784, 788 (10th Cir.), cert. denied, 449 U.S. 877, 101 S. Ct. 223, 66 L. Ed. 2d 99 (1980); *United States* v. *Jackson,* 579 F.2d 553, 560 (10th Cir. 1978); *Wagster* v. *Overberg,* supra. This is a "heavy burden." *Wagster* v. *Overberg,* supra, 740. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States* v. *Agurs,* supra, 109–10.

To prevail on a claimed violation of *Brady* and its progeny requires proof of: "(a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense,[21] and (c) the materiality of the evidence." *Moore* v. *Illinois,* 408 U.S. 786, 794–95, 92 S. Ct. 2562, 33 L. Ed. 2d 706, reh. denied, 409 U.S. 897, 93 S. Ct. 87, 34 L. Ed. 2d 155 (1972). The defendant argues that the photos were material. It is very often true, and it is true here, that the materiality of the evidence in question is key. See, e.g., *United States* v. *Winner,* 641 F.2d 825, 833 (10th Cir. 1981);

---

[21] Even conceding that the defendant has satisfied this prong of the test, he must satisfy all three prongs including materiality.

*Talamante* v. *Romero,* supra, 787. "Proof of materiality is important because '*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation.'" *Talamante* v. *Romero,* supra, quoting *United States* v. *Beasley,* 576 F.2d 626, 630 (5th Cir. 1978), cert. denied, 440 U.S. 947, 99 S. Ct. 1426, 59 L. Ed. 2d 636 (1979); see *United States* v. *Winner,* supra, 832.

"Due to the large array of evidence which can be considered favorable to the defense, courts have employed a sliding scale analysis in determining what level of materiality must be proven in order to establish a *Brady* violation. See *United States* v. *Agurs,* supra; *United States* v. *Jackson,* 579 F.2d 553 (10th Cir. 1978), cert. denied, sub nom., *Allen* v. *United States,* 439 U.S. 981, 99 S. Ct. 569, 58 L. Ed. 2d 652 (1978)." *Talamante* v. *Romero,* supra, 787. The third level of materiality announced by *Agurs* that applies to the defendant's general request here provides that his conviction will be constitutionally flawed only "if the omitted evidence creates a reasonable doubt [as to his guilt] that did not otherwise exist . . . ." *United States* v. *Agurs,* supra, 112; *United States* v. *Stassi,* 544 F.2d 579, 584 (2d Cir. 1976); *State* v. *Packard,* 184 Conn. 258, 279, 439 A.2d 983 (1981). "This means that the omission must be evaluated in the context of the entire record." *United States* v. *Agurs,* supra; see *State* v. *Packard,* supra.

The issue of materiality is complicated by two somewhat intertwined circumstances peculiar to this case: the fact that no record was kept of the photos viewed on July 21 and the occurrence or nonoccurrence of the alleged viewing by Cook sometime between July 21 and August 31. Taking up the allegation of the photos selected on July 21, there

is no claim that there was a lack of procedural due process in the actual photo selection and so the inability to regroup or produce those photos does not make the photographic identification invalid per se. See *United States* v. *Clemons,* 445 F.2d 711, 714 (D.C. Cir.), cert. denied, 404 U.S. 956, 92 S. Ct. 322, 30 L. Ed. 2d 273 (1971). "Admittedly, it might have been a better procedure if the Police Depart-ment had kept a record of all such pictorial arrays. See *United States* v. *Hamilton,* 137 U.S. App. D.C. 89, 92, 420 F.2d 1292, 1295 (1969)." *United States* v. *Clemons,* supra; see *People* v. *Adams,* 92 Mich. App. 619, 625, 285 N.W.2d 392 (1979). We have said that "[a]lthough the practice [of retention and preservation for examination at trial of the photo-graphs at a pretrial identification] is highly desir-able, it cannot be held, as a matter of law, to be a necessary condition precedent to a permissible in-court identification." *State* v. *Lally,* 167 Conn. 601, 607, 356 A.2d 897, cert. denied, 423 U.S. 829, 96 S. Ct. 48, 46 L. Ed. 2d 46 (1975). Constitutional error does not arise unless the "omitted evidence," evaluated on the entire record, creates a reasonable doubt that did not otherwise exist. *United States* v. *Agurs,* supra, 112. Here there is no such rea-sonable doubt. Cook picked one photo out on July 21, when her memory was fresh and it was that of the defendant. That photo was in evidence and she made an unequivocal in-court identification of him. In addition, her testimony also included an accurate and detailed description of the robber which she gave to the police right after the rob-bery. This bolstered her in-court identification. The significance of any photos selected by Kennedy on July 21 is not even minimal as the defendant specifically withdrew his motion to suppress as against her. Thereafter, she made an in-court iden-

tification of the defendant. There was thus a strong independent source for the identification of the defendant as the robber apart from the photo identifications. The defendant cross-examined both Cook and Kennedy at some length on their identification testimony. The jury therefore had evidence before it which, if believed, putting aside any identification by photo, would sustain the identification of the defendant as the robber.

The entire identification issue, including whether the identification procedures were suggestive, was thoroughly tried to the jury. See *Commonwealth* v. *LaPierre,* 10 Mass. App. 641, 411 N.E.2d 1314 (1980). Moreover, the question whether the alleged photo viewing by Cook at her home ever took place was left for the jury to decide.[22] The court charged the jury in detail concerning identification. In an instruction quite favorable to the defendant, it permitted the jury, over the exception of the state, to draw, if they wished, an unfavorable inference against the state for the nonproduction of photographs.[23] We are not dealing with a guilty verdict which "is already of questionable validity, [where] additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *United States* v. *Agurs,* supra, 113. The materiality

[22] Even if we assume, arguendo, that it did take place as Bucchieri seemed to claim, even he admitted that "she didn't make an identification." This hardly helps the defendant in demonstrating the exculpatory nature of the identification procedures "in the context of the entire record." *United States* v. *Agurs,* 427 U.S. 97, 112, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976).

[23] The court, in response to a request to charge by the defendant, instructed the jury as follows: "Now, the failure of the prosecution to produce some of the photographs that were referred to by the witnesses that were not here in court is something that you can take into consideration, and you are permitted, as members of the jury, to infer that this evidence could or would be unfavorable to the prosecution's case if they were produced."

of the evidence in question has not been demonstrated and so the "omitted evidence" does not rise to the level of constitutional error as claimed.

There is no error.

In this opinion the other judges concurred.