## STATE OF CONNECTICUT *v.* MURRAY R. GOLD

COTTER, C. J., LOISELLE, BOGDANSKI, SPEZIALE and PETERS, Js.

620

Argued November 15, 1979—decision released May 15, 1980

*Louis Nizer,* of the New York bar, with whom were *Timothy C. Moynihan* and, on the brief, *Francis M. Donnarumma* and *Kenneth L. Shluger,* for the appellant (defendant).

*Francis M. McDonald,* state's attorney, with whom were *Walter H. Scanlon,* chief assistant state's attorney, and *Richard L. Shiffrin,* assistant state's attorney, for the appellee (state).

SPEZIALE, J. On October 15, 1974, a grand jury in the judicial district of Waterbury returned a true bill comprised of two counts, indicting the defendant, Murray Gold, for the murders of Irving and Rhoda Pasternak, his former in-laws, on September 26, 1974.[1] On March 31, 1976, the defendant's first trial ended in a mistrial, when the jury was unable to reach a verdict. After a second trial, the defendant was found guilty of both murders, and on January 26, 1977, he was sentenced on each count

[1] Gold had been married for a brief period of time to Barbara Pasternak. At the time of the murders the couple had been divorced for approximately eleven years.

to a term of not less than twenty-five years nor more than life at the Connecticut correctional institution at Somers, with the sentences to be served concurrently.

The charges against the defendant arose out of the violent deaths of Irving and Rhoda Pasternak on the evening of September 26, 1974. After dining with their daughter, Myrna Kahan, and her family on September 26, the Pasternaks returned to their home at 53 Fern Street, Waterbury, at approximately 8:30 p.m. At about 9 p.m. that same night, Mrs. Pasternak telephoned Myrna Kahan from the upstairs master bedroom. While the two were conversing on the telephone, the doorbell at the Pasternak home rang. Mrs. Kahan heard her mother caution Mr. Pasternak not to open the door until he saw who was there. A short while later Mrs. Pasternak's voice changed and became excited. She told Mrs. Kahan that she heard Mr. Pasternak say "Get away from me. Get out of my house" and she instructed her to send Dr. Kahan, her husband, "over here fast." Immediately Mrs. Kahan called the emergency 911 telephone number. It was 9:12 p.m. On another telephone located in his home, Dr. Kahan immediately called a Waterbury police officer, Arnold Mark, who was related to the Pasternaks through marriage, and asked him to go to the Pasternak home, which was located a few blocks from where Mark lived. At 9:13 p.m. Mrs. Pasternak, herself, called the emergency 911 number to report a "crazy man" at their home. Mrs. Kahan telephoned the Pasternak's next door neighbor, Fred Rubenstein, who, at Mrs. Kahan's request, looked out a window of his house and observed the Pasternak home. Rubenstein reported that he saw nothing unusual; he said that he saw a car parked in the

Pasternak driveway, which he described to Mrs. Kahan as possibly a Volkswagon or some smaller car, but which he later identified as the Pasternaks' car. He also indicated that the porch light at the front door was lit.

Mark arrived at the Pasternak home within one and one-half minutes after he was called by Dr. Kahan at approximately 9:12 p.m. Mark observed Mr. Pasternak lying on the floor in the kitchen, his body covered with blood and mutilated by approximately thirty-five knife wounds. Upstairs he found Mrs. Pasternak dead in the master bedroom; she had been stabbed approximately twenty-five times. In the room he also saw a "Buck" hunting knife covered with blood, which was leaned against a pair of Mr. Pasternak's shoes. As Mark was descending the stairs, Dr. Kahan and his son ran into the house; the son was sent to call an ambulance at a neighbor's home. He went to see Fred Rubenstein, who called the 911 police emergency number at 9:19 p.m., some seven minutes, ten seconds after Mrs. Kahan's call and some six minutes, fifty-four seconds after Mrs. Pasternak's call.

Aside from the knife found by Mark, other evidence found in the house included an empty bottle-size brown paper bag and a discharged fire extinguisher, which were discovered in the vicinity of the front foyer and living room. A residue of powder was found on the fire extinguisher, on the oval-shaped mirror in the foyer, on the wall near the mirror, and on the living room rug. A trail of bloody footprints, some of which displayed Cat's Paw heel marks, led from the body of Mr. Pasternak to the foyer and stairs leading to the second floor. In a pair of blue trousers hung over a chair in the

Pasternak master bedroom, $1174 was found. There was no evidence of robbery or theft. All money and valuables were intact and the house was not ransacked.

During investigation by the Waterbury police department a button was photographed in the master bedroom. It was photographed first on the center of the floor between the doorway and the bed and later on the floor near the television. In the first photograph the button had two white plastic loops in the buttonholes; in the second photograph the loops were on the floor a distance of two feet from the button. Mark, the first person to arrive at the Pasternak home, testified that he saw a dark button near the television set in the master bedroom. On September 27, 1974, the day after the murders, trooper Henry Maynard of the Connecticut state police made a sketch of the crime scene, including the master bedroom. He did not see a button in that bedroom, and a button was not initially included in the sketch. A day or two later, however, Maynard added a button to the sketch, but did not remember at whose direction. The subsequent state police investigation also produced numerous latent finger and palm prints; a total of twenty-seven prints were identified; one palm print and eight fingerprints which were identifiable were not identified. Neither the paper bag, the fire extinguisher, the knife handle, nor the button showed any identifiable fingerprints, palm prints, or finger ridge detail. From the evidence he observed at the crime scene, trooper Luneau, the Connecticut state policeman who was in charge of the latent fingerprint section of the forensic laboratory, was of the opinion that the assailant wore gloves. None of the prints identified matched those of Murray Gold.

James McDonald of the New Haven crime laboratory testified that as a result of his reexamination of the Pasternak house on September 30, 1974, he found two white plastic loops on the floor of the Pasternak master bedroom. He also testified that he removed from the blue shag rug in the master bedroom a small white plastic cylinder having the same appearance as the two plastic loops. McDonald identified these items as being parts of plastic that come with buttoneer kits. A buttoneer kit which the state claimed was seized from the defendant's New York apartment was admitted into evidence. From tests he conducted, McDonald concluded that the plastic pieces he had found in the Pasternak bedroom had been attached to the stubs left on the "base tie" in the buttoneer kit allegedly seized from Gold's apartment.

On appeal the defendant has raised numerous claims. Our ruling concerning declarations against penal interest is dispositive and mandates a new trial. Nevertheless, we address other issues that would be likely to arise at retrial.

I

### DECLARATIONS AGAINST PENAL INTEREST

#### A. DEFENDANT'S OFFER OF PROOF

The defense attempted to introduce certain evidence in order to raise the possibility that one Bruce Sanford, who had committed suicide on December 10, 1974, committed the Pasternak murders. This evidence included alleged statements by Sanford against his penal interest, identification testimony by Dorothy Crocco, testimony regarding the activities of Sanford on the date of the murders and subsequent thereto, and testimony as to physical

evidence claimed to link Sanford to the crimes. More specifically, in a hearing outside the presence of the jury, the following testimony was elicited: Glorianna Sanford, the wife of Bruce Sanford, testified that on September 26, 1974, the day of the Pasternak murders, Sanford had been drinking and was "kind of plastered" and "without expression." When his wife told him that she couldn't allow him to behave in this manner in front of the children, he walked into the bathroom and when he emerged, he had cut his throat. The following day, September 27, 1974, Sanford and his wife drove to Florida.

Patricia Morrison testified that she had been a friend of Bruce Sanford for twenty years. On September 24, 1974, two nights before the murders, she received a telephone call from Sanford. He was very upset about Mr. Pasternak. He had told her, "The bastard is representing my wife. He's telling her things and I think he's gonna sell her out." Morrison also stated that Sanford told her that if his wife "didn't get what she had coming to her from this hearing, that he would get the no good Jew bastard one way or the other," and that he went on and on swearing about Pasternak until she got him calmed down about it. On September 26, 1974, the night of the murders, Sanford called Morrison late in the evening, possibly after 1 a.m. He told her he needed her help, and that he had "just done something that he wasn't gonna be able to get out of." When she asked him where he was, he replied, "I'm in a phone booth. I'm covered with blood." He asked Morrison to help him get out of the state. She refused.

Robert Bourassa, who had been a friend of Sanford's for approximately a year before Sanford's suicide, testified that on the night of the murders,

September 26, 1974, he and a friend, Craig Yashenko, went to Sanford's home at approximately 8 p.m. as a result of a telephone call from Glorianna Sanford. When they arrived she told them that she could not find Sanford, and she wanted Bourassa to go through the house with her to find him. Sanford could not be located. Later that evening Bourassa and Yashenko returned to the Sanford home. In the basement Glorianna showed both of them a blue denim shirt covered with blood.

Bourassa last spoke with Sanford on December 10, 1974, the night Sanford committed suicide. Sanford had telephoned Bourassa and had stated that he was going to kill himself, that he could not stand living, that he was going to get caught, that he was sorry for what he did, and that he was sorry for killing Rhoda.

Yashenko gave testimony substantially in accord with that of Bourassa. He also testified that he was on an extension line when Sanford called Bourassa in December of 1974 and that he heard Sanford say, inter alia, that he was sorry that he had to kill Mrs. Pasternak.

Anthony Borrelli, who was a member of the same motorcycle club as Sanford, testified that on the morning of September 27, 1974, the day after the Pasternak murders, he saw Sanford with stitches on his throat. When asked by Borrelli what he had been doing, Sanford replied that he had been "squaring away [with] people that were fucking with his wife." In response to Borrelli's query about where he had gotten the stitches, Sanford said that he "knows some people that could use more stitches than he got."

At the conclusion of this offer of proof, defense counsel argued for the admissibility of the Sanford-related evidence and urged the court, inter alia, that the types of evidence offered needed to be kept separate; that is, that evidence "factual in nature" needed to be distinguished from the claimed exceptions to the hearsay rule.[2] The trial court ruled inadmissible the "testimony in connection with the alleged confessions . . . of one Bruce Sanford" and, thus, excluded in toto the evidence set forth above. An exception was duly noted.

Stating that "if further evidence developed that would tie in Mr. Sanford to this crime even more closely than we think he is tied in now, we hope we can renew the motion," defense counsel then sought to introduce additional evidence claimed to link Sanford to the Pasternak murders, including a witness who it was claimed would be able to make an identification. Over the defendant's objection, this testimony, too, was heard outside the presence of the jury: Dorothy Crocco testified that during the evening of September 26, 1974, she was visiting friends, Mr. and Mrs. Walk, who were living on Fern Street, Waterbury, the street on which the Pasternaks lived. When another friend, Mrs. Haight, arrived between 9 and 9:30 p.m., they went out to meet her. Seeing a lot of commotion on the

---

[2] "Mr. Kunstler: Judge, we are going to be quite clear. There are various aspects of the testimony you have heard today that — one aspect is the question of a confession or admission. That is in a different category to things that are associated with the res gestae in this case, and things which are purely physical in nature. The possession of a blood-stained shirt is a physical act and not a question of any statements. I think your Honor has to carefully keep these separate. At least we have to be careful in keeping separate those things which are factual in nature and those things which are exceptions, we claim are exceptions to the hearsay rule. They are all mixed up in this offer of proof."

street, as well as several police cars arriving, they walked down the street. A man came running toward them on the side of the street opposite from that on which the Pasternaks lived. Crocco described the man as approximately six feet tall and as being in his late 20s or early 30s. Crocco identified a photograph of Sanford as the man she saw running toward her, and stated that he was clean shaven the night of September 26, and that the wind was blowing through the hair on his head. She stated that he almost knocked her down. Further, Crocco indicated that she did not see where he came out of, but that he was "running like the devil."

Subsequent to the Crocco testimony, defense counsel sought to "reopen" the court's decision excluding the evidence concerning Bruce Sanford, and again attempted to distinguish between the hearsay and nonhearsay evidence.[3] Defense counsel's request to have the Sanford-related evidence heard by the jury was denied. The trial court ruled the statements against penal interest inadmissible,

---

[3] "Mr. Kunstler: I don't think you understand my question, Judge. We'd like to call in our case Glorianna Sanford to testify only to the relationship between the Sanford . . . family [and] the Pasternaks and the Kahans, to call Craig Yashenko and Robert Bourassa as to seeing a bloody shirt, what appeared to them to be a bloody shirt that evening in the Sanford home, call the three women that we have here to testify as to what they saw that night. I'm asking you whether you're excluding that as independent evidence, independent of any statements, confessions or any other aspect.

We are offering those not to prove statements or confessions, although we take an exception to your ruling on that part. We are offering it as direct evidence to go with the fact that a person was running from the scene of the crime . . . . I'm not offering that for hearsay purposes, just what they saw that night and what Glorianna Sanford testified here . . . none of which has anything to do with hearsay but has to do with observations and direct evidence. We are offering them."

citing *State* v. *Stallings,* 154 Conn. 272, 224 A.2d 718 (1966), and *State* v. *Marshall,* 166 Conn. 593, 353 A.2d 756 (1974). The trial court noted, inter alia, that "even if [it] were inclined to follow the Federal rule," the Sanford-related evidence did not "measure up to" the requirements of rule 804 (b) (3) of the Federal Rules of Evidence. From the trial court's statements, set forth in the footnote,[4] it is evident that the trial court reached and decided the issue of whether the proffered testimony met at least the threshold level of trustworthiness required in the federal courts. The nonhearsay evidence relating to Sanford was ruled inadmissible because the trial court found "no relevancy." Again, an exception was taken. The defendant was permitted, however, to introduce only evidence that an unidentified person was running or walking swiftly from the vicinity of the crime scene. Thus, none of the testimony specifically relating to Sanford was heard by the jury.

On appeal the defendant claims that the trial court committed reversible error in its evidentiary

[4] "The Court: Well, the Court's ruling is that the evidence does not change the Court's previous ruling with reference to the admissibility of the proffered hearsay confessions either under the Connecticut law, as set forth by the Connecticut Supreme Court in the cases I have already cited, including, of course, *State* against *Marshall* in [166 Conn. 593], nor does it even measure up to the requirements of the Federal rule 804 (b) (3), the last sentence of which reads as follows — not to mention some other previous requirements in the rule — but the last sentence reads: 'A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.' I don't think that this additional evidence adds anything to the corroborating circumstances that clearly indicate any trustworthiness of the statement, even if the Court were inclined to follow the Federal rule, nor does it comply with the rationale of cases such as *State* against *Larsen,* in 415 P.2d 685, a 1966 Idaho case."

ruling excluding all Sanford-related evidence. He also claims that the exclusion of this proffered testimony denied him his constitutional "right to defend and his right to due process of law."

## B. THE CONNECTICUT RULE

In *State* v. *DeFreitas,* 179 Conn. 431, 426 A.2d 799 (1980), we overruled *State* v. *Stallings,* supra, and its progeny to the extent that they held inadmissible on policy grounds all statements against penal interest exculpatory to the defendant. We adopted a rule, consistent with *Chambers* v. *Mississippi,* 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), and in accord with rule 804 (b) (3) of the Federal Rules of Evidence, providing that trustworthy third-party statements against penal interest exculpatory to the defendant[5] are admissible if the declarant is unavailable. *State* v. *DeFreitas,* supra, 450–51. As we noted in *DeFreitas,* supra, 451, the Connecticut rule requires, as does rule 804 (b) (3) of the Federal Rules of Evidence, that the trustworthiness of a third-party declaration against penal interest be examined carefully.[6] Rule 804 (b) (3) of the Federal Rules of Evidence requires

---

[5] A statement exculpatory to a defendant is one which either exonerates or which might reduce the degree of punishment to which the defendant might be exposed even if the remark does not completely exonerate the defendant. See *Brady* v. *State,* 226 Md. 422, 174 A.2d 167 (1961), aff'd sub nom. *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[6] It should be noted that we specifically rejected in *State* v. *DeFreitas,* 179 Conn. 431, 426 A.2d 799 (1980), the rule adopted by jurisdictions such as Florida, Michigan, New York, California, and Hawaii, under which a declaration against interest is admissible without a threshold showing of trustworthiness. *State* v. *DeFreitas,* supra, 8 n.9; *Baker* v. *Florida,* 336 So. 2d 364 (Fla. 1976); *People* v. *Edwards,* 396 Mich. 551, 566, 242 N.W.2d 739 (1976); *People* v. *Brown,* 26 N.Y.2d 88, 257 N.E.2d 16 (1970); *People* v. *Spriggs,* 60 Cal. 2d 868, 389 P.2d 377 (1964) (en banc). See also *State* v. *Leong,* 51 Hawaii 581, 465 P.2d 560 (1970).

that "corroborating circumstances clearly indicate the trustworthiness of the statement" before the statement is admissible to exculpate the accused. This grants the defendant a fair opportunity to defend against the state's accusations,[7] retains the integrity of the jury as a finder of fact and judge of credibility, and does not seriously handicap the administration of justice. See *State* v. *Gervais,* 317 A.2d 796, 802 (Me. 1974).

## 1. Admissibility of the Sanford Declarations

Bruce Sanford committed suicide on December 10, 1974, and hence was unavailable at the time of trial. Therefore, the questions remaining to be considered are whether the confession to Bourassa, and overheard by Yashenko, and the statements to Borrelli and Morrison constituted declarations against penal interest and whether the threshold level of trustworthiness was satisfied.

### a. Confession

Sanford's statement to Bourassa that he was "sorry he had to kill Rhoda" was unquestionably

---

[7] Justice Holmes noted in his oft-quoted dissenting opinion in *Donnelly* v. *United States,* 228 U.S. 243, 277–78, 33 S. Ct. 449, 57 L. Ed. 820 (1913): "The confession of Joe Dick, since deceased, that he committed the murder for which the plaintiff in error was tried, coupled with circumstances pointing to its truth, would have a very strong tendency to make any one outside of a court of justice believe that Donnelly did not commit the crime. . . . The rules of evidence in the main are based on experience, logic and common sense, less hampered by history than some parts of the substantive law . . . [T]he exception to the hearsay rule in the case of declarations against interest is well known; no other statement is so much against interest as a confession of murder; it is far more calculated to convince than dying declarations, which would be let in to hang a man . . . and when we surround the accused with so many safeguards, some of which seem to me excessive, I think we ought to give him the benefit of a fact that, if proved, commonly would have such weight."

against his penal interest; it was a confession to murder. We now consider whether that statement was sufficiently trustworthy to have met the level of trustworthiness required by our rule for the confession to be admissible as a statement against penal interest. Initially, it should be pointed out that for a statement to be admissible it does not have to be absolutely trustworthy. If this were the requirement, the province of the jury as the finder of fact and weigher of credibility would be entirely invaded. "[W]e would not read the standard of trustworthiness as imposing a standard so strict as to be utterly unrealistic. Even in *Donnelly* [v. *United States,* 228 U.S. 243, 33 S. Ct. 449, 57 L. Ed. 820 (1913)] and *Chambers* [v. *Mississippi,* 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)] the evidence, while strongly corroborated, could have been disbelieved by the jury." *United States* v. *Barrett,* 539 F.2d 244, 253 (1st Cir. 1976).

Unlike *DeFreitas,* supra, where there was virtually no showing of trustworthiness regarding the claimed confessions of the only unavailable declarant,[8] here there are numerous factors tending to show trustworthiness.

As to the trustworthiness of the Sanford confession to Bourassa that he was "sorry he had to kill Rhoda," we commence with a consideration of the factors enumerated in *Chambers* v. *Mississippi,* supra, 300–301. "First, each of McDonald's [the declarant's] confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by

---

[8] We described the Robichaud statements against interest as "clearly untrustworthy" in *State* v. *DeFreitas,* 179 Conn. 431, 453, 426 A.2d 799 (1980).

some other evidence in the case—McDonald's sworn confession, the testimony of an eyewitness to the shooting, the testimony that McDonald was seen with a gun immediately after the shooting, and proof of his prior ownership of a .22-caliber revolver and subsequent purchase of a new weapon. The sheer number of independent confessions provided additional corroboration for each. Third, whatever may be the parameters of the penal-interest rationale, each confession here was in a very real sense self-incriminatory and unquestionably against interest. . . . Finally, if there was any question about the truthfulness of the extrajudicial statements, McDonald was present in the courtroom and was under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury." (Footnote omitted.)

Courts have taken from *Chambers* four general considerations for determining trustworthiness: "(1) the time of the declaration and the party to whom the declaration was made; (2) the existence of corroborating evidence in the case; (3) the extent to which the declaration is really against the declarant's penal interest; (4) the availability of the declarant as a witness." *United States* v. *Guillette,* 547 F.2d 743, 754 (2d Cir. 1976), cert. denied, 434 U.S. 839, 98 S. Ct. 132, 54 L. Ed. 2d 102 (1977). See *United States* v. *Oropeza,* 564 F.2d 316, 325 (9th Cir. 1977); *State* v. *DeFreitas,* supra, 451; *Henson* v. *United States,* 399 A.2d 16, 19 (D.C. App. 1979); *People* v. *Foster,* 66 Ill. App. 3d 292, 294, 383 N.E.2d 788 (1978).

Although, as we noted in *State* v. *DeFreitas,* supra, 454 n.11, "no single factor in the test we adopt for determining the trustworthiness of third

party declarations against penal interest is necessarily conclusive," the following factors here demonstrate that the Sanford statement to Bourassa met the threshold level of trustworthiness.

We commence with an examination of the first factor enumerated above—the time of the declaration and the party to whom it was made. The statement was made within three months after the Pasternak murders, which is relatively close to the time the crimes occurred. Compare *United States* v. *Satterfield,* 572 F.2d 687 (9th Cir.), cert. denied, 439 U.S. 840, 99 S. Ct. 128, 58 L. Ed. 2d 138 (1978) (confession made two years after the crime). Also, the statement was made to a friend whom the declarant, himself, had contacted. Compare *Lowery* v. *State,* 401 F. Sup. 604 (D. Md. 1975), aff'd without opinion, 532 F.2d 750 (4th Cir.), cert. denied, 429 U.S. 919, 97 S. Ct. 312, 50 L. Ed. 2d 285 (1976) (affidavit sworn to before prison official).

Additionally, regarding the second factor, a myriad of corroborating circumstances were present which were indicative of reliability. The Sanford confession was made spontaneously; compare *Lowery* v. *State,* supra (spontaneity is an indicium of reliability and declarant's affidavit sworn to before prison official not spontaneous); and was not induced by Gold. See *United States* v. *Satterfield,* supra, 693; *People* v. *Lettrich,* 413 Ill. 172, 108 N.E.2d 488 (1952). The statement was made at the time Sanford was contemplating suicide and, in fact, on the very evening he made the confession to Bourassa he took his own life. It does not appear that there was any motive for Sanford to exculpate Gold, inasmuch as no connection between these two individuals was shown or suggested. Compare

*State* v. *Higginbotham,* 298 Minn. 1, 5, 212 N.W.2d 881 (1973) (declarant lived with the defendant's family, was often referred to as the defendant's brother, and was likely to have fabricated the confession out of a desire to free his close friend). Sanford, however, apparently believed he had a reason to "get" Pasternak. He thought that Pasternak was representing his wife, Glorianna, and that he was taking advantage of her.[9] Yashenko testified that he overheard the confession on an extension telephone. Compare *People* v. *Craven,* 54 Ill. 2d 419, 429, 299 N.E.2d 1 (1973) (declaration heard only by woman living with defendant). There is no indication that the statement might have been made to curry favor with the authorities. Compare *United States* v. *Love,* 592 F.2d 1022 (8th Cir. 1979). See also Notes of the Advisory Committee on Proposed Rules, at 28 U.S.C.A. Fed. R. Evid. 804, reprinted in 4 Weinstein, Evidence, p. 804–24 (a statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest). Cf. *United States* v. *Rogers,* 549 F.2d 490, 498 n.8 (8th Cir. 1976) (recognizing that declarant's interest in obtaining a lesser sentence for his cooperation could have affected the reliability of the statement where statement made after guilty plea and before sentencing).

Further, other corroborating circumstances exist. Dorothy Crocco placed Sanford in the vicinity of the crime, identifying him as the man she had seen

---

[9] Sanford had told Morrison: "The bastard [Pasternak] is representing my wife. He's telling her things and I think he's gonna sell her out. . . . [and that if she] didn't get what she had coming to her from this hearing, that he would get the no good Jew bastard one way or the other." At the time of his murder, Pasternak was a practicing attorney in the city of Waterbury.

running from the direction of the Pasternak home shortly after the murders. Compare *United States* v. *Guillette,* supra, 754 (no independent evidence such as reports of eyewitnesses placing declarant in vicinity of victim's home at time of crime). According to testimony by Bourassa and Yashenko, Sanford was in the state the day of the murders, and was absent from his home at the approximate time of these crimes. Thus, Sanford had an opportunity to commit the murders. Both Bourassa and Yashenko testified that they were shown a bloody blue denim shirt by Sanford's wife when they returned to Sanford's home later in the evening of the Pasternak murders. Glorianna Sanford testified that she and Sanford drove to Florida the day after the Pasternak murders. Flight may justify an inference of guilt. *State* v. *Piskorski,* 177 Conn. 677, 722–23, 419 A.2d 866 (1979). Finally, as in *Chambers,* supra, there were statements made to other persons in which Sanford implicated himself in the crimes. He told Morrison that he "would get" Pasternak, and, approximately four hours after the murders, told her that he was in a phone booth, was covered with blood, and had "just done something that he wasn't gonna be able to get out of." The morning after the Pasternak murders Sanford told Borrelli that he "was squaring away [with] people that were fucking with his wife" and that he knew some people who could use more stitches than he had on his neck. These statements were, and are, relevant in determining whether the confession, which was indisputably a declaration against penal interest, was trustworthy.

Regarding the third factor, the extent to which the declaration is against the declarant's penal interest, we note that the confession to the murder of

Rhoda Pasternak could not have been more against Sanford's penal interest. Although application of the fourth factor, availability of the declarant as a witness, does not bolster the reliability of the confession inasmuch as Sanford was unavailable at the time of the trial, other circumstances delineated above clearly indicate the trustworthiness of the confession. Fed. R. Evid. 804 (b) (3).

In cases in which exclusion of a declaration against penal interest exculpatory to the defendant did not constitute error, the showing of trustworthiness was significantly less substantial than it was here. For example, in *United States* v. *Guillette,* supra, 754, the court noted that the statement was made to a police informant whom the declarant had just met and with whom he was drinking; that the declarant had had a number of drinks before making the statement; that there was no independent evidence tying the declarant to the crime; that there were no reports placing the declarant in the vicinity of the crime; and that the government was unable to locate the declarant. In *United States* v. *Satterfield,* supra, 693, there was a substantial length of time between the crimes, which occurred in 1974, and the declaration, which was made in 1976; there was an "absence" of corroboration for the declarant's version of the crimes; and there was "good reason to believe" that the argument during which certain declarations against interest were made was "staged" by the defendant and the declarant, and that the declarant's other statements against interest also, were fabricated. In *Taggart* v. *State,* 269 Ind. 667, 382 N.E.2d 916 (1978), the Indiana Supreme Court upheld the exclusion of a typewritten confession that was delivered to the defend-

ant's son-in-law by an individual who said that the declarant would sign the statement only if he received $5000, and that he would repudiate the statement in court unless he received the money first. That court noted, "the entire circumstances surrounding the origin of this 'confession' are permeated with indicia of untrustworthiness." Id., 671. In *United States* v. *Hoyos,* 573 F.2d 1111, 1115 (9th Cir. 1978), the court found that the excluded statement was not significantly inculpatory of the declarant; that it was not spontaneous and was made only after the declarant's arrest; and that it was made only to the declarant's wife. In *United States* v. *Hughes,* 529 F.2d 838, 840–41 (5th Cir. 1976), exclusion of a statement against interest was not found to constitute a denial of due process because, unlike the *Chambers* case, the defendant there was not directly prevented from cross-examining the declarant defense witness because he never sought to treat him as an adverse witness; there was no independent evidence corroborating the substance of the declarant's prior statements; and the statements were not necessarily exculpatory in that they may only have shown that the declarant and defendant were accomplices.

On the other hand, cases in which exclusion of the declaration against penal interest exculpatory to the defendant was found to have constituted error demonstrate a level of trustworthiness considerably more proximate to that in the present case. For example, in *United States* v. *Goodlow,* 500 F.2d 954, 958 (8th Cir. 1974), the circumstances showing the trustworthiness of the statements included the facts that two witnesses in addition to the defendant were prepared to testify that they heard the declarant make the statements; that each of these witnesses

specified the time and place at which the statements were made and identified the persons who were present; that the car involved in the crime belonged to the declarant's sister; that a police officer testified that the declarant was "known" for the type of crime with which the defendant was charged; and that the several discrepancies in the government informant's identification of the defendant made it "at least plausible" that the declarant and not the defendant committed the crime. See also *United States* v. *Thomas,* 571 F.2d 285, 289 (5th Cir. 1978); *United States* v. *Benveniste,* 564 F.2d 335, 339–42 (9th Cir. 1977); *United States* v. *Atkins,* 558 F.2d 133, 135 (3d Cir. 1977).

In conclusion, we hold that the exclusion of the Bourassa testimony regarding Sanford's confession was in violation of our statement against penal interest exception to the hearsay rule because the corroborating circumstances clearly indicate that the confession was trustworthy. In view of this holding we need not consider whether the exclusion of this evidence deprived the defendant of his constitutional right to due process of law.[10] "We thus follow the recognized policy of self-restraint and the basic judicial duty to eschew unnecessary determinations of constitutional questions. *Pepin* v. *Danbury,* 171 Conn. 74, 88, 368 A.2d 88 [1976]. See also

[10] We noted in *State* v. *Mastropetre,* 175 Conn. 512, 520, 400 A.2d 276 (1978), "'The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process.' *Chambers* v. *Mississippi,* 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)."

Exclusion of testimony which does not come within our exceptions to the hearsay rule nonetheless may violate due process. *Green* v. *Georgia,* 442 U.S. 95, 99 S. Ct. 2150, 60 L. Ed. 2d 738 (1979).

*Rescue Army* v. *Municipal Court,* 331 U.S. 549, 568–73, 67 S. Ct. 1409, 91 L. Ed. 1666 [1947]; *Ashwander* v. *Tennessee Valley Authority,* 297 U.S. 288, 346–47, 56 S. Ct. 466, 80 L. Ed. 688 [1936] (Brandeis, J., concurring). See generally A. Bickel, The Least Dangerous Branch: The Supreme Court at the Bar of Politics (1962)." *Negron* v. *Warden,* 180 Conn. 153, 166–67, 429 A.2d 841 (1980). Where an evidentiary error not of constitutional dimension is found, the defendant must show that the error was harmful. See *State* v. *Sorbo,* 174 Conn. 253, 257, 386 A.2d 221 (1978); *Aillon* v. *State,* 168 Conn. 541, 547–48, 363 A.2d 49 (1975); *State* v. *L'Heureux,* 166 Conn. 312, 323–24, 348 A.2d 578 (1974). We conclude that the defendant has met that burden here.

### b. Other Statements Against Penal Interest

To reiterate, Morrison testified during the offer of proof that Sanford had telephoned her two nights before the murders and told her that he "would get" Pasternak. Additionally, on the night of the murders he called her to tell her that he needed her help, and that he had just done something he was not going to be able to get out of. He also said that he was in a phone booth and was covered with blood. Borrelli, a member of a motorcycle club Sanford rode with, testified that the morning after the Pasternak murders he saw Sanford with stitches on his throat. Sanford, when asked by Borrelli what he had been doing, replied that he was "squaring away [with] people" who were bothering his wife; he also stated that he knew some people who could use more stitches than he had. At trial the grounds urged for admissibility were that the statements constituted exceptions to the hearsay rule in that they were declarations against penal interest and were dying

declarations. The defendant also claimed that the statement to Morrison that he "would get" Pasternak was admissible either under *State* v. *Hawley*, 63 Conn. 47, 27 A. 417 (1893), as a threat, or under the state of mind exception to the hearsay rule pursuant to which a declaration indicating a present intention to do an act in the future is relevant to show that the act probably was done as planned.[11] On appeal the defendant has argued primarily that the statements were against penal interest.

This is the first case in which this court has been faced with defining a statement against penal interest and with deciding whether a particular declaration other than a confession comes within this exception to the hearsay rule.

McCormick notes, "[a]s to what is against penal interest, quite obviously the essential characteristic is exposure to risk of punishment for crime. Thus either a direct admission of guilt or an admission of implicating circumstances suffices." (Footnote omitted.) McCormick, Evidence § 278, p. 83 (1979 Sup.). Federal rule 804 (b) (3) defines a statement against penal interest as "[a] statement which . . . at the time of its making . . . so far tended to subject him [the declarant] to . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." This rule, in referring to statements that *tend* to subject the declarant to criminal liability, encompasses those disserving statements by a declarant that would have probative value in a trial

---

[11] At trial the defendant cited *State* v. *Journey*, 115 Conn. 344, 161 A. 515 (1932), in support of this theory. In *Journey*, testimony by the wife of the decedent that her husband had told her when he left their home that morning that he was going to work for the defendant was admissible to prove that he acted accordingly.

against him. *United States* v. *Thomas,* 571 F.2d 285, 288 (5th Cir. 1978). Thus, a statement has been found to have met this standard where a reasonable person would have realized that remarks of the sort attributed to the declarant—" 'No, Buckey [Barrett] wasn't involved. It was Buzzy'—strongly implied his personal participation in the . . . crimes and hence would tend to subject him to criminal liability. Though by no means conclusive, the statement would be important evidence against [the declarant] were he himself on trial for the . . . crimes." *United States* v. *Barrett,* 539 F.2d 244, 251 (1st Cir. 1976). See also *United States* v. *Alvarez,* 584 F.2d 694, 700 (5th Cir. 1978). (The declarations were against penal interest because they " 'strengthened the impression that [the declarant] had an insider's knowledge of the crimes.' ")

Several states have adopted the broad definition of statement against penal interest contained in rule 804 (b) (3) of the Federal Rules of Evidence or a definition of similar breadth. *Commonwealth* v. *Keizer,* Mass. , 385 N.E.2d 1001 (1979); see also Ark. Stat. Ann. § 28-1001, Rule 804 (b) (3); Cal. Evid. Code § 1230 (Deering); Me. Rev. Stat. Ann. tit. 14, Rule 804 (b) (3); N.J. Stat. Ann. § 2A:84A, Rule 63 (10); N.M. Stat. Ann., Court Rules, Rule 804 (b) (4); Wis. Stat. Ann. § 908.045 (4) (West). We are persuaded of the logic and soundness of the federal rule and the trend to reject a narrow and inflexible definition of a statement against penal interest in favor of a definition which includes not only confessions, but other remarks which would tend to incriminate the declarant were he or she the individual charged with the crime. Where a statement is exceedingly inculpatory, but

falls short of being a confession, we cannot say that the statement is, therefore, so inherently untruthful as to be always withheld from the jury's consideration.[12]

This court now rules that a statement against penal interest is one which at the time it is made so far tends to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless he or she believed it to be true. In *State* v. *DeFreitas,* supra, 451–52, we noted that "[i]n requiring that the trustworthiness of a third party declaration against penal interest be examined carefully . . . the rule we adopt is in accord with the Federal Rules of Evidence . . . ." (Footnote omitted.) Here, we go a step further and adopt the definition of statement against penal interest contained in the Federal Rules of Evidence.[13]

---

[12] Further, although statements other than confessions may constitute declarations against penal interest, we stated in *State* v. *DeFreitas,* 179 Conn. 431, 451, 426 A.2d 799 (1980), that a factor for determining whether a statement against penal interest meets the threshold level of trustworthiness required by our rule is the extent to which a statement is really against the declarant's interest. Obviously a confession is more against a declarant's interest than is a statement which is not a confession, and, hence, would more readily meet the threshold level of trustworthiness required.

[13] Federal Rules of Evidence, rule 804, provides in relevant part: ". . . (b) Hearsay exceptions.—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: . . . (3) Statement against interest.—A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

We find that the Sanford statements to Morrison and Borrelli fall squarely within the definition of statement against penal interest that we have now adopted. The admissibility of these statements, however, depends on whether they meet the threshold level of trustworthiness which we discussed at length in the preceding section of this opinion. The statements to Morrison, a friend of some twenty years, were made spontaneously by Sanford when he telephoned her both two nights before and on the very night of the murders. The strong corroborating evidence, discussed above, clearly indicates the trustworthiness of the statements. Additionally, although falling short of a confession, the statements were exceedingly inculpatory to Sanford, such that a reasonable person would not have made them unless he or she believed them to be true. We find that these statements meet the threshold level of trustworthiness required of statements against penal interest.

Likewise, the statement to Borrelli meets the threshold level of trustworthiness. Borrelli was a member of the same motorcycle club as Sanford, and the statement was made the day following the murders. Again, the numerous corroborating circumstances clearly indicate the trustworthiness of this statement.

As to all of the above declarations against penal interest, the trial court considered the issue of trustworthiness and decided that the corroborating circumstances did not clearly indicate the trustworthiness of the statements; accordingly, it ruled that all the declarations were not admissible. For the reasons set forth above, we disagree and conclude that the trial court abused its discretion. We find error and order a new trial.

Our holding is dispositive of this appeal; however, we give consideration to certain of the defendant's other claims of error which are likely to arise upon retrial.

## II

### MATTERS LIKELY TO ARISE ON RETRIAL

#### A. SANFORD-RELATED NONHEARSAY

During the offer of proof, nonhearsay evidence was elicited which was claimed to link Sanford to the murders. This included testimony regarding a bloody shirt seen in Sanford's home the night of the murders; testimony by Crocco identifying Sanford as the man she saw running from the vicinity of the Pasternak home shortly after the murders; and evidence of Sanford's sudden departure for Florida the day after the murders. All Sanford-related evidence which the trial court did not exclude on hearsay grounds it excluded as having "no relevancy."

"No precise and universal test of relevancy is furnished by the law, and the question must be determined in each case according to the teachings of reason and judicial experience. *Eason* v. *Williams,* 169 Conn. 589, 591, 363 A.2d 1090 [1975]; *State* v. *Towles,* 155 Conn. 516, 523, 235 A.2d 639 [1967]." *State* v. *Runkles,* 174 Conn. 405, 413, 389 A.2d 730, cert. denied, 439 U.S. 859, 99 S. Ct. 177, 58 L. Ed. 2d 168 (1978). We have noted that " 'Evidence is admissible when it tends to establish a fact in issue or to corroborate other direct evidence in the case. One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in connection with other facts, renders the existence of the other either

certain or more probable. Unless excluded by some rule or principle of law, any fact may be proved which logically tends to aid the trier in the determination of the issue. . . . *State* v. *Towles,* 155 Conn. 516, 523, 235 A.2d 639 [1967]; *Pope Foundation, Inc.* v. *New York, N.H. & H.R. Co.,* 106 Conn. 423, 435, 138 A. 444 [1927].' " *State* v. *Villafane,* 171 Conn. 644, 674–75, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977).

Although a court has wide discretion in its rulings on the relevancy of evidence; *State* v. *Carr,* 172 Conn. 458, 464, 374 A.2d 1107 (1977); we conclude that the trial court abused its discretion in finding irrelevant all nonhearsay evidence linking Sanford to the crimes. Of particular concern is the exclusion of the testimony of Dorothy Crocco that she saw a man whom she identified as Sanford "running like the devil" from the vicinity of the Pasternak residence at the time police cars were arriving at the scene. Given all the other testimony offered to link Sanford with the murders, the trial court erroneously ruled this evidence irrelevant, thereby implicitly concluding that this identification testimony did not render "more probable" the fact that Gold was not guilty of the Pasternak murders. See *State* v. *Villafane,* supra, 675. " '[I]t is always competent for a [defendant] to give evidence tending to show that another committed the crime [with] which he is charged . . . .' " *State* v. *Marshall,* 166 Conn. 593, 601, 353 A.2d 756 (1974).

The state claims that the Crocco identification of Sanford was "absolutely compromised" because although Sanford had a mustache and goatee both before and immediately after the murders, Crocco

had testified that the man she saw running did not have such facial hair. Further, the state notes that although Crocco testified that the man who ran past her had long hair, Sanford had shaved his head bald at the time of the murders. We point out, however, that it is the function of the trier of fact to determine the credibility of witnesses. *State v. Holley,* 174 Conn. 22, 28, 381 A.2d 539 (1977). See also *Brooks v. Tennessee,* 406 U.S. 605, 611, 92 S. Ct. 1891, 32 L. Ed. 2d 358 (1972). The Crocco identification provided some evidence which directly connected Sanford with the crimes. Once that evidence was adduced, other evidence concerning Sanford's involvement in the crime became admissible. *State v. Kinsey,* 173 Conn. 344, 347-48, 377 A.2d 1095 (1977).

### B. SEIZURE OF BUTTONEER KIT

The defendant claims on appeal that the trial court erred in admitting into evidence the buttoneer kit "purportedly" seized from the defendant's apartment by Detective O'Connell of the New York City police department. Upon the request of the Waterbury police department, O'Connell and other New York City police officers had gone to Gold's apartment at about 3 a.m. on October 4, 1974. Gold met the officers at the door and, after being advised of his *Miranda* rights, signed a written consent to search his apartment. The written consent simply stated "I, Murray Gold, of 108-48 70th Road, Apartment 6J, Forest Hills, New York, hereby consent to a search of my premises." O'Connell, however, when asking Gold to sign the consent, told him that the police were "searching for items in connection with the homicide in Waterbury." After Gold signed the form consenting to the search, he was informed

of and shown the search warrant that the New York police already had obtained for shoes with Cat's Paw heels and a suit coat missing a brown button.

While searching Gold's apartment, O'Connell observed a button-fastening kit in the linen closet, which kit contained four brown suit coat buttons similar to the button described in the search warrant application. O'Connell removed the buttoneer kit from the defendant's linen closet, took it into the hallway outside Gold's apartment, and while the door to the apartment was open, showed it to Sergeant Messina of the Waterbury police department who had been waiting in the hallway during the search of the apartment by the New York police. After the kit was examined by Messina, O'Connell returned it to the defendant's linen closet. Subsequently, the New York police obtained a second warrant which authorized the seizure of the buttoneer kit, and, pursuant to that warrant, the kit was seized.

First, the defendant claims that the search warrant for the shoes and suit coat was only a guise for admission into the Gold apartment and that the search was violative of the fourth amendment to the United States constitution under *Coolidge* v. *New Hampshire,* 403 U.S. 443, 471, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971), because, although the kit was not named in this search warrant, the presence of the Waterbury police officer permitted the New York police to "know in advance" what they would seize. The defendant's second theory is that although "mere evidence" is subject to seizure under *Warden* v. *Hayden,* 387 U.S. 294, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (1967), the seizure of the buttoneer kit by O'Connell was unconstitutional because there

was no nexus between the kit and criminal behavior at the moment it was seized, but, rather, only after the seizure when the kit was shown to Messina. Thirdly, the defendant claims that the New York police exceeded the consent given by Gold to search his apartment by showing the buttoneer kit to Messina in the hall outside Gold's apartment; the claim is that the defendant's waiver of his right to privacy extended only to the New York police, but not to the Waterbury police. On the ground that the warrant subsequently issued authorizing seizure of the buttoneer kit was a "fruit of the poisonous tree," the defendant claims that it should have been suppressed under *Wong Sun* v. *United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

The defendant's first claim, that the seizure was illegal under *Coolidge* v. *New Hampshire,* supra, may be readily rejected. In that case, the state's contention that the seizure of an automobile was justified on the grounds of the "plain view" exception to the warrant requirement was rejected by the court because the police had sufficient opportunity to secure a warrant; they knew the automobile's exact description and location well in advance of the seizure, and had intended to seize it; and the case did not involve contraband, stolen goods, or objects dangerous in themselves.[14] *Coolidge* v. *New Hamp-*

[14] In *Coolidge* v. *New Hampshire*, 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971), the court noted (p. 471): "If the initial intrusion is bottomed upon a warrant that fails to mention a particular object, though the police know its location and intend to seize it, then there is a violation of the express constitutional requirement of 'Warrants . . . particularly describing . . . [the] things to be seized.' The initial intrusion may, of course, be legitimated not by a warrant but by one of the exceptions to the warrant requirement, such as hot pursuit or search incident to lawful arrest. But to extend the scope of such an intrusion to the seizure of objects—not contraband nor stolen nor dangerous in themselves—which the

*shire,* supra, 472. Here, there is no indication that when the New York police entered Gold's home at approximately 3 a.m. they had any inkling that a buttoneer kit would be located therein. That Messina was waiting in the outside hall does not alter this fact in the slightest.

The second contention, that the New York police seized the buttoneer kit before they became aware of its potential worth as "mere evidence" is also without merit. We note that the New York police were legally in the Gold apartment and were conducting a lawful search. They had obtained a search and seizure warrant, the validity of which has not been challenged. They also had obtained Gold's consent to search the apartment; the voluntariness of that consent has not been attacked. See *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *State* v. *Chetcuti,* 173 Conn. 165, 171–72, 377 A.2d 263 (1977). The buttoneer kit was lawfully discovered during the search. Lawful discovery alone, however, does not provide a legal basis for the seizure of an item. Were this the law, police would be empowered to make wholesale seizures of innumerable items. Such wholesale seizures "would unquestionably violate the Fourth Amendment." 2 LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 6.7, p. 477. (Footnote omitted.) Rather, there must be a connection—a nexus—between the items seized and criminal activity. *Warden* v. *Hayden,* 387 U.S. 294, 307, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (1967). "[I]n the case of 'mere evidence,' probable cause must be

police know in advance they will find in plain view and intend to seize, would fly in the face of the basic rule that no amount of probable cause can justify a warrantless seizure." (Footnote omitted.)

examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction." *Warden* v. *Hayden, supra,* 307. See also *State* v. *DeChamplain,* 179 Conn. 522, 528–29, 427 A.2d 1338 (1980); 1 LaFave, Search and Seizure, supra, § 2.6 (d), p. 390; 2 LaFave, Search and Seizure, supra, §§ 4.1 (b), p. 7, and 8.1, p. 630.

The defendant claims the seizure was invalid because probable cause to believe that the buttoneer kit was "mere evidence" did not exist until the kit was shown to Messina. We assume, arguendo, that the defendant is correct in his contention that the seizure occurred prior to the time at which the buttoneer kit was shown to Messina who was standing in the hallway.[15] We reject, however, his claim that probable cause that the kit constituted "mere evidence" did not exist prior to this point.

As we noted above, when the New York police arrived at the Gold apartment they had in their possession a warrant to search the premises and to seize "a pair of shoes, consisting of half soles and cats paw heels, [and] a suit coat with a button torn away." Attached to this warrant was an affidavit which set forth the details of the Pasternak murders and certain information linking Gold with these crimes. The affidavit stated that "[a]dditional evidence at the scene of the murder consists of a suit coat button, brown in color. This button does

---

[15] It appears to us, however, that a broad consent to search would, in most instances, imply a consent to touch and move in a reasonable manner certain objects. For example, consent to search a room for a coat would imply, absent a limitation on such consent, a consent to open a partially closed closet door and to move aside other garments to search for the coat in issue. Such action would not generally mean that the closet door and other garments had been seized. See 2 LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.1, p. 625.

not match any item of clothing at the Pasternak home." When the New York police officers arrived at Gold's apartment they knew that a brown suit coat button matching the one found at the murder scene could be of great assistance in solving the crimes. Thus, when they first came upon the buttoneer kit containing four brown suit coat buttons of the type described in the affidavit, they had probable cause to believe that the buttoneer kit did constitute "mere evidence." The fact that the kit was shown to Messina in the hallway does not affect the validity of the prior seizure. Nor does the fact that the New York police returned the kit to the linen closet and, exercising caution, subsequently sought and obtained a warrant authorizing the seizure of the buttoneer kit in any way undermine the initial valid seizure.

The third claim of the defendant, that the New York police exceeded the consent given by Gold to search his apartment by showing the buttoneer kit to Messina in the hallway is also without merit. Once the New York police had validly seized the kit, they were not barred from showing it to other individuals who could assist in establishing whether the item seized was, in fact, evidence which would link a particular suspect to the crimes.

## C. IN-COURT IDENTIFICATION

Kim (Kelly) Perugini[16] made an in-court identification of Murray Gold as being the man she saw in a car which was parked on Fern Street, Waterbury, and which was facing toward the Pasternak home at 7:20 a.m. on September 23, 1974, three days before the Pasternak murders. The defend-

---

[16] Kim Perugini married prior to the trial and therefore is referred to in the transcript as Kim Kelly.

ant claims that the trial court's denial of his motion to suppress the in-court identification deprived him of due process, because this identification was tainted by a suggestive pretrial photographic identification procedure. The error is claimed to be harmful because the in-court identification placed the defendant at the scene of the crimes shortly before the murders and contradicted a statement that O'Connell had testified Gold made to him in which Gold asserted that he visited Waterbury only on September 16, 1974.

During a hearing outside the presence of the jury, Perugini testified, inter alia, to the following: In September of 1974 she lived on Fern Street in Waterbury. At about 7:20 a.m. on the morning of September 23, 1974, she left her house to drive to school. As she walked down the driveway she noticed that a man was sitting in a car which was facing her car. She described the car as being dark, big, and blue, and described its occupant as being a man with a bushy mustache, very dark hair, and a receding hairline. This dark blue car was parked one foot or less from the front of her car. The day was fair and it was light. The windshields of both cars were clear. She sat facing and observing the man for about two minutes while she warmed up her car.

On October 17, 1974, approximately three weeks after Perugini saw the man in the dark blue car, three Waterbury police officers took a photographic display to her home. The court file contains the display which shows ten individual photographs of white males with mustaches, which photographs were arranged in two rows, each row containing five pictures. Only the defendant's photograph had an

"inked-in" mustache. One male also had a beard. All the photographs were of approximately the same size. Although the backgrounds of the photographs ranged from white to grey, there were several photographs having backgrounds of approximately the same light shade as that of the defendant's photograph. The photograph of the defendant was the only one having a height measuring scale on it.

Perugini testified further during this hearing that she had looked at the display for approximately seven to ten minutes before selecting the photograph of the defendant, beneath which she printed "K. Perugini." Perugini testified that the police did not suggest in any way that she select any particular photograph, but, only asked her if the photograph of the man she saw in the car was among those on the display. Perugini responded affirmatively on three separate occasions when asked if her in-court identification was based upon her memory of the man she saw in the car on September 23, and was not influenced by the photographs she was shown. Further, she testified that although she noticed that the mustache on the defendant's photograph was "inked-in," this did not play any part in her identifying that photograph. Perugini further indicated that she did not notice the scale behind the defendant in his photograph when she was shown the photographic display.

Over the defendant's objection, the trial court, having found that this identification was based not on the photographic display, but on her recollection of the man she saw on September 23, admitted Perugini's in-court identification of the defendant. An exception was duly taken.

The danger of misidentification of a suspect by a witness, present even if the police follow the most correct photographic identification procedure, is increased where, for example, police show the witness a display of several pictures among which the photograph of a single individual is in some way emphasized. *Simmons* v. *United States,* 390 U.S. 377, 383, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968); *State* v. *Hafner,* 168 Conn. 230, 238, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975). The problem is that where there is an initial misidentification, the witness is subsequently likely to retain in his or her memory the image of the photograph rather than of the person actually seen. *Simmons* v. *United States,* supra, 383.

Thus, in assessing the admissibility of in-court identification testimony, reliability is the "linchpin." *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *State* v. *Piskorski,* 177 Conn. 677, 742, 419 A.2d 866 (1979). Reliability is to be determined by the totality of the circumstances as emphasized in *Stovall* v. *Denno,* 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967), and *Neil* v. *Biggers,* 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). *State* v. *Piskorski,* supra, 742.

Because the photograph of the defendant was the only one in which a mustache had been drawn in, it was unnecessarily suggestive. It was unnecessary because the police readily could have included in the display other photographs with mustaches drawn on them. It was suggestive because the police showed the witness pictures of several individuals among which the photograph of a single individual—Gold—was emphasized. See *State* v.

*Hafner,* supra, 238; see also *Simmons* v. *United States,* supra, 383. " 'A procedure is unfair which suggests in advance of identification by the witness the identity of the person suspected by the police.' " *People* v. *Hunt,* 19 Cal. 3d 888, 894, 568 P.2d 376 (1977), quoting *People* v. *Slutts,* 259 Cal. App. 2d 886, 891, 66 Cal. Rptr. 862 (1968).[17] Where a feature is placed on the defendant's photograph in order to make the picture conform to the witness' description of the criminal he or she had seen, the identification proceeding has been held to have been rendered highly suggestive. *People* v. *Slutts,* supra; annot., 39 A.L.R.3d 1000, 1013. Even where the subsequent in-court identification has been held to have been admissible because it had an independent origin, such sketching on a photograph has been specifically mentioned as an identification procedure "not to be commended." *People* v. *Rodgers,* 53 Ill. 2d 207, 213, 290 N.E.2d 251 (1972). We agree.

In determining the admissibility of an in-court identification, however, we must consider other factors in addition to the unnecessary suggestiveness of a prior identification procedure. These factors " 'include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation. Against these factors is to be weighed the corrupting effect of the suggestive iden-

---

[17] Courts have distinguished between cases in which the sketching in of the feature occurred before the witness selected a particular picture; *People* v. *Slutts,* 259 Cal. App. 2d 886, 891, 66 Cal. Rptr. 862 (1968); and where the witness already had selected a picture in accordance with permissible procedures and the drawing in of a feature was used as a confirmatory tool. *Ash* v. *United States,* 313 F. Sup. 961, 965 (D.D.C. 1970); *People* v. *Slutts,* supra.

tification itself.' *Manson* v. *Brathwaite,* supra, 114 (citing *Neil* v. *Biggers,* supra, 199–200)." *State* v. *Piskorski,* supra, 742.

Application of the above factors to the circumstances present in this case reveals that the trial court did not err in determining that the in-court identification was independent of the pretrial photographic identification procedure and was based on what Perugini had seen the morning of September 23. While the cars were almost bumper to bumper during the early daylight hours of a clear day, Perugini had an unobstructed view of the man in the dark blue car for approximately two minutes. Her attention was focused on the man because she testified that during this two-minute interval she stared at him and he stared at her. This is not a situation where the identifying witness was under emotional stress at the time of the crime. The description that she gave to police before the photographic identification procedure, that the man had a "bushy mustache, very dark hair, and a receding hairline," although somewhat sketchy, does accurately describe the defendant. Further, at no time during either the hearing outside the presence of the jury or during her testimony at trial did Perugini evidence any uncertainty about whether the man whose photograph she identified was, in fact, the individual she had seen in the car on September 23. Finally, the witness' pretrial photographic identification of Gold occurred only approximately three weeks after she had seen the man.

Balanced against the above factors, under the totality of the circumstances, the "corrupting effect" of the suggestive pretrial photographic identifica-

tion itself did not have such a tendency to give rise to a substantial likelihood of irreparable mistaken identification that the in-court identification had to be excluded. *Simmons* v. *United States,* supra, 384; *State* v. *Williams,* 173 Conn. 545, 552, 378 A.2d 588 (1977).

The trial court did not err in its conclusion that the state had met its burden of establishing that the in-court identification was based upon observation independent of the suggestive pretrial identification procedure.

D. REMARKS OF THE STATE'S ATTORNEY
DURING FINAL ARGUMENT

The defendant claims that the trial court erred in denying his motion for a mistrial based on certain comments made by the state's attorney during final argument.

The state's attorney concluded his final argument with the following statement: "Now, when Mr. Kunstler says to you you'll wake up screaming if you return the verdict of guilty, I say to you you'll wake up screaming if you return a verdict of not guilty, because to do good to the bad, the spirit of the bad, is to do evil to the good and make you responsible, you, yes, you, for all the acts this man may subsequently commit, because you let him go free. Thank you for your attention."[18]

Defense counsel moved for a mistrial on the basis of the above comments; the trial court denied the

[18] For clarification purposes we note that Mr. Kunstler's remarks as indicated in the transcript are as follows: "But if you have a reasonable doubt, you must stand firm or you will wake up screaming some night."

motion, and an exception was taken. No specific cautionary instruction was subsequently given the jury regarding the above remarks.

We have previously cited with approval ABA, Standards Relating to the Prosecution Function and the Defense Function § 5.8 (1971); *State* v. *Carr,* 172 Conn. 458, 470, 374 A.2d 1107 (1977); subsection (d) of which provides as follows: "The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict."

The state's attorney improperly argued the necessity of preventing further injury to society by the defendant himself. A defendant is on trial for what has been done and not for what he or she might do. *State* v. *Raspberry,* 452 S.W.2d 169, 172 (Mo. 1970); *State* v. *Mobley,* 369 S.W.2d 576, 581 (Mo. 1963). Also, by threatening that a verdict of not guilty would make "you responsible, you, yes, you, for all the acts this man may subsequently commit, because you let him go free," the state's attorney even further diverted the jury from its duty to decide the case solely on the evidence.

## III

### CONCLUSION

Trustworthy declarations against penal interest exculpatory to a defendant are admissible if the declarant is unavailable. In *State* v. *DeFreitas,* supra, we adopted the same standard of trustworthiness as is required by rule 804 (b) (3) of the Federal Rules of Evidence. Here, we go a step

further and adopt a definition of statement against penal interest which is the same as that contained in this federal rule.

For the reasons set forth above, the offered statements of Bruce Sanford met all the requirements of our rule regarding declarations against penal interest.

There is error, the judgment is set aside and a new trial is ordered.

In this opinion the other judges concurred.